In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-4312

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEWAYNE LUSTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 CR 74—**Sarah Evans Barker**, *Judge.*

ARGUED MAY 1, 2006—DECIDED MARCH 15, 2007

Before EASTERBROOK, *Chief Judge*, and MANION and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A jury convicted Dewayne Luster of conspiring to possess cocaine with intent to distribute, and the district court sentenced him to 200 months' imprisonment. Luster claims the trial evidence was insufficient to support his conviction. He also argues the district court erred in admitting testimony that he purchased drugs from one of the coconspirators prior to the charged conspiracy. Lastly, he challenges his guidelines sentencing enhancement for possession of a firearm by his coconspirators. We find none of Luster's arguments persuasive and affirm his conviction and sentence.

First, ample evidence supported the jury's finding that Luster participated in an extensive cocaine distribution operation headed by codefendant Prentice Davis. Numerous recordings of telephone conversations between Luster and Dramane Johnson, Davis's primary distribution agent, showed Luster placing frequent orders for large quantities of cocaine he knew were tied to Davis. This and other evidence permitted the inference that Luster worked cooperatively with Johnson and Davis to distribute cocaine and was not merely in a "buyer-seller" relationship with them, as he maintains. Second, the evidence Luster argues should have been excluded—Davis's testimony that Luster bought cocaine from him in 2000—was properly admitted under the "inextricably intertwined" doctrine because it provided the jury essential background information about the origins and operational structure of the charged conspiracy. Third, the district court properly applied the firearms sentencing enhancement because Luster reasonably could have foreseen that Davis and Johnson possessed firearms in furtherance of their large cocaine distribution enterprise.

## I.  Background

Federal agents linked Dewayne Luster to a cocaine distribution ring Prentice Davis ran out of his Indianapolis music studio. Davis would purchase large quantities of cocaine on credit from a supplier in Chicago and then pay Dramane Johnson, his cousin, to resell most of it to smaller distributors in the Indianapolis area. The government alleged Luster was one such distributor because on several occasions agents observed him (either via wiretaps or surveillance) placing and discussing orders with Johnson for "tank tops" and "tee shirts," words the government contended were code for 4.5 and 9 ounces of cocaine, respectively. The government ultimately charged

Davis, Johnson, Luster, and four others with conspiracy to distribute cocaine from September 2003 to May 2004, but only Luster proceeded to trial. A jury convicted him and the district court sentenced Luster to 200 months' imprisonment.

At trial the government presented three categories of evidence against Luster: (1) wiretap and surveillance records of Luster's dealings with Davis and Johnson; (2) physical items seized from Luster's apartment; and (3) Davis's testimony detailing the system by which he and Johnson structured their cocaine transactions, some of which involved Luster. The wiretap and surveillance evidence included several recordings of phone conversations from 2003 and 2004 in which Luster ordered "tank tops" from Johnson. Acting on one of these conversations, local law enforcement officers observed Luster and Johnson meeting in person in a liquor store parking lot in February 2004 to discuss a "tank top" order. The evidence seized from Luster's apartment included detailed ledgers and a cocaine "rebricker," two items a testifying federal narcotics agent identified as common tools of the cocaine trade.

Davis, testifying pursuant to his plea agreement, explained at length the inner workings of his cocaine distribution operation. After driving to Chicago to pick up multiple kilograms of cocaine, Davis would return to Indianapolis and pay Johnson to do most of the leg work. Though Davis occasionally sold cocaine directly to customers, it was generally Johnson who brokered individual transactions and found new customers, and Davis paid him at a rate of $500 per kilogram sold or delivered. Johnson had unfettered access to Davis's cocaine and was permitted to sell it without first paying Davis or obtaining his permission. Johnson's only obligation was to reimburse Davis at a predetermined wholesale rate for the cocaine he sold. In addition to the $500-per-kilogram flat

fee, any percentage Johnson charged his customers above the wholesale rate was his profit to keep.

Davis testified that he neither sold drugs nor discussed drugs with Luster from September 2003 to May 2004, the period of the alleged conspiracy. Davis did state, however, that he saw Luster and Johnson together as often as twice a week during this period, and that he generally had no interest in knowing the identities of the people buying his cocaine from Johnson. Davis also testified about a 2000 incident in which Luster stopped by his recording studio. Luster said he was tired of purchasing Davis's cocaine from "Rio," one of Davis's other middlemen, and asked to buy a half-kilogram directly from Davis. Davis sold the cocaine to Luster, but because Luster ultimately paid only $7000 of the $11,500 the two agreed upon, Davis refused to make any future sales directly to Luster. Luster had opposed the government's pretrial motion to admit Davis's testimony about the 2000 transaction, arguing that it was prejudicial "other acts" character evidence, but the district court ruled the testimony admissible under the "inextricably intertwined" doctrine and as evidence of Luster's knowledge and intent, permissible noncharacter purposes under Federal Rule of Evidence 404(b).

The trial lasted one week and culminated in a jury verdict against Luster. At sentencing Luster objected to the proposed finding in his presentence report that possession of firearms by his codefendants was reasonably foreseeable to him, a two-level enhancement under U.S.S.G. § 2D1.1(b)(1). The district court overruled Luster's objection and factored the enhancement into Luster's advisory guidelines range of 188 to 235 months. The court then sentenced Luster to 200 months' imprisonment and 5 years' supervised release.

## II. Discussion

Davis raises three challenges to his conviction and sentence. First, he claims the evidence adduced at trial was insufficient to support the jury's determination that he conspired to possess cocaine with intent to distribute between September 2003 and May 2004. Second, he maintains the district court abused its discretion by allowing Davis to testify about the 2000 drug transaction. Third, he argues the district court clearly erred at sentencing by finding that Luster could have reasonably foreseen the possession of firearms by his coconspirators. All three claims lack merit.

### A. Sufficiency of the Evidence

Defendants challenging the quantum of evidence supporting a jury verdict face a daunting task. We view the evidence in a light most favorable to the prosecution and will reverse only if no juror could have found guilt beyond a reasonable doubt. *United States v. Leahy*, 464 F.3d 773, 794 (7th Cir. 2006). As such, the question we must ask ourselves is whether any rational juror could have found that between September 2003 and May 2004, Luster conspired to possess cocaine with the intent to distribute it. Stated more precisely to reflect the elements of a drug conspiracy, the question is whether any rational juror could find that (1) two or more people agreed to possess and distribute cocaine, and (2) Luster knowingly and intentionally joined in this agreement. *United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004). The government's evidence at trial easily permitted the inference that Luster intentionally participated in such an agreement.

Standing alone, a simple buyer-seller relationship does not establish a conspiratorial agreement because each party acts "at arms-length, each trying to get the better

deal, rather than cooperatively." *United States v. Shi*, 317 F.3d 715, 717 (7th Cir. 2003). Had Luster engaged in a one-time transaction with Johnson and had no dealings with him before or after, this might look more like a buyer-seller relationship than a conspiracy. *See United States v. Smith*, 34 F.3d 514, 523 (7th Cir. 1994). But the evidence shows a prolonged cooperative relationship between Davis, Johnson, and Luster, replete with code words, routine and standardized transactions, and a significant degree of mutual trust and dependence, all strong indicia of a conspiratorial agreement. *United States v. Tingle*, 183 F.3d 719, 724 (7th Cir. 1999).

Luster was aware as early as 2000 that Davis was dealing cocaine, and during the conspiratorial period, Luster purchased Davis's cocaine from Johnson so frequently that on one occasion instead of ordering his usual "tank top," he was overheard telling Johnson to give him the "same" as last time. While repeat sales, even when characterized by a certain comfort and regularity, do not alone establish a conspiratorial relationship, *United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001), when taken together with the evidence of Luster's prolonged stake in and knowledge of the Davis-Johnson venture, they paint a convincing picture of a conspiracy, that is, a criminal agreement of mutual trust, dependence, and cooperation. *See United States v. Medina*, 430 F.3d 869, 881 (7th Cir. 2005); *see also United States v. Hall*, 109 F.3d 1227, 1232 (7th Cir. 1997) ("Routine sales for resale can create a mutual interest between buyer and seller in maintaining their continuing relationship that extends beyond the moment of each individual sale."). Luster trusted Johnson to deliver the cocaine to his apartment and even warned Johnson against making a delivery on one occasion because Luster had unexpected company at his apartment. Moreover, just as the success of Luster's mid-level cocaine distribution business depended upon a

steady flow of bulk cocaine from Johnson and Davis, the success of the Davis-Johnson operation, which obtained cocaine on credit from a Chicago supplier, depended upon reliable downstream distributors like Luster to patch into the retail market. In other words, it took the cooperation of Luster, Johnson, and Davis to keep the regular and profitable flow of cocaine from bulk supplier to end user moving. A rational juror could easily conclude from the government's evidence, including the ledgers and "rebricker" found at his apartment, that Luster intentionally participated in a cooperative, pyramid-style arrangement to possess cocaine with the intent to distribute it.

## B. Admissibility of the 2000 Transaction Between Luster and Davis

Luster also claims the district court should have excluded Davis's testimony concerning his 2000 cocaine transaction with Luster. We review evidentiary rulings for abuse of discretion. *United States v. Conley*, 291 F.3d 464, 472 (7th Cir. 2002). Because the indictment alleged a conspiracy lasting from 2003 to 2004, Luster argues that evidence of the 2000 drug transaction constituted unduly prejudicial "propensity" evidence. The district court disagreed, finding the evidence admissible under "either or both" the "inextricably intertwined" doctrine or Rule 404(b). The record contains ample support for the district court's ruling.

Acts that are "inextricably intertwined" with the crime on trial are admissible in this circuit because they lie outside the purview of the Rule 404(b) character/propensity prohibition, *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006), the logic being that Rule 404(b) only applies to "other" crimes, wrongs, or acts, not acts directly related to (i.e., "inextricably intertwined" with) the crime on trial. *United States v. Senffner*, 280 F.3d 755,

764 (7th Cir. 2002). The "inextricably intertwined" doctrine is not without its critics, *United States v. Bowie*, 232 F.3d 923, 927-28 (D.C. Cir. 2000), but has nonetheless consistently been applied in this circuit. *E.g.*, *McLee*, 436 F.3d at 760; *United States v. Ojomo*, 332 F.3d 485, 489 (7th Cir. 2003). Evidence is inextricably intertwined if it helps to complete the story of the crime by filling a conceptual or chronological void. *McLee*, 436 F.3d at 760. Davis's testimony that he sold Luster a half-kilogram of cocaine in 2000, but thereafter refused to directly sell to him, helped the jury fill a conceptual void in the government's case—the lack of any direct dealings in 2003 and 2004 between Luster and Davis, the conspiracy ringleader. Prior to Davis's testimony, the jury heard a wealth of evidence linking Luster and Johnson during the conspiratorial period. Indeed, based on the wiretap and surveillance evidence, the jury might have thought the only person Luster conspired with was Johnson. But the government alleged a conspiracy headed by Davis, not Johnson, and thus the 2000 Davis-Luster transaction helped the jury piece together the contours of the charged conspiracy and the relationships among its actors.

Davis's testimony about the 2000 drug transaction helped explain why Luster obtained Davis's cocaine from Johnson, not Davis, in 2003 and 2004. Luster's inability to repay all of the $11,500 he owed Davis for the 2000 transaction soured Davis to the idea of using Luster directly as a primary distributor in 2003 and 2004. The transaction also showed that Luster was well aware of Davis's role as kingpin of the operation despite his exclusive dealings with Johnson in 2003 and 2004. In short, the 2000 transaction rounded out the jury's understanding of the operational structure of the conspiracy as it appeared in 2003 and 2004. This type of informative background evidence is especially probative and useful to the jury in drug conspiracy cases. *McLee*, 436 F.3d at 760;

*United States v. Hughes*, 213 F.3d 323, 329 (7th Cir. 2000). Moreover, any prejudicial effect was blunted by the limiting instruction the district court gave at the conclusion of Davis's testimony. Thus, we cannot say the district court abused its discretion in admitting testimony concerning the 2000 drug transaction.

Because we find the "inextricably intertwined" doctrine supported the admissibility of the 2000 transaction, we need not address the district court's alternative conclusion that the evidence was not inadmissible under Rule 404(b). In the interests of clarity, however, we briefly note that even though the "inextricably intertwined" doctrine is premised upon the inapplicability of Rule 404(b), *Senffner*, 280 F.3d at 764, in practice the two standards may overlap. *See United States v. Robinson*, 161 F.3d 463, 470 (7th Cir. 1998) (explaining that postrobbery flight can be construed as intricately related to the robbery itself and thus outside the scope of Rule 404(b) or as evidence of a guilty conscience admissible as noncharacter evidence under the exception to the rule). Such is the case with Davis's testimony concerning his 2000 cocaine sale to Luster. On one hand it provides a vital background story to the charged conspiracy that renders it admissible under the inextricably intertwined doctrine. It could also be construed as an "other" act tending to show Luster's knowledge of Davis's operation and specific intent to join the conspiracy, two permissible noncharacter purposes under Rule 404(b). In other words, there was nothing inherently contradictory in the district court's ruling that the testimony was admissible under the "inextricably intertwined" doctrine and as permissible noncharacter evidence of knowledge and intent under Rule 404(b).

## C.  The Firearms Sentencing Enhancement

Luster also challenges his two-point sentencing enhance-ment under U.S.S.G. §§ 2D1.1(b)(1) and 1B1.3(a)(1)(B) for possession of firearms by his coconspirators. He maintains he had no idea of the scale of the Davis-Johnson operation and thus could not have reasonably foreseen the possibility that the two men would possess firearms in connection with it. We review the district court's fact-finding on the enhancement for clear error. *United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir. 2002). Because one permissible inference from the record is that Luster knew Johnson and Davis possessed firearms in connec-tion with their large cocaine operation, the district court did not clearly err in applying the enhancement.

Although U.S.S.G. § 2D1.1(b)(1) appears to penalize only those defendants who actually possess a firearm in the course of committing a drug offense, section 1B1.3(a)(1)(B) makes clear that defendants can also be on the hook for firearms possessed by their coconspirators so long as such possession was reasonably foreseeable. Put another way, before applying the section 2D1.1(b)(1) enhancement to a defendant like Luster who was not himself found to have possessed a firearm during the conspiracy, the district court must make two findings. First, it must find by a preponderance of the evidence that someone in the conspiracy actually possessed a firearm in furtherance of the conspiracy. *United States v. Olson*, 450 F.3d 655, 684 (7th Cir. 2006). This is not an onerous burden, as firearms found in close proximity to illegal drugs create a presumption that they are possessed in connection with the drug offense. *United States v. Booker*, 248 F.3d 683, 689 (7th Cir. 2001). Here, the record established that Davis stored large quantities of drugs and firearms at his music studio during the conspiratorial period. It also established that Johnson regularly carried a gun during the course of the conspiracy. This evidence supports

the district court's conclusion that Davis and Johnson possessed firearms in connection with the drug conspiracy.

Second, the district court must determine that the coconspirator's firearm possession was reasonably foreseeable to the defendant. U.S.S.G. § 1B1.3(a)(1)(B). The evidence established that Luster visited Davis's music studio many times during the conspiracy. His frequent presence at the studio, where the drugs and guns were stored, and his knowledge of Davis's large-scale cocaine distribution operation, raise the inference that he could have reasonably foreseen his coconspirator's possession of firearms for intimidation or protection. *See United States v. Cantero*, 995 F.2d 1407, 1412 (7th Cir. 1993) ("[D]rug dealers often carry weapons to protect themselves and their large amounts of drugs and cash."). Moreover, the evidence established that Johnson regularly carried a gun and also that on at least one occasion during the conspiracy, Luster asked Johnson for his help in delivering cocaine to one of Luster's customers. Luster reasonably could have foreseen that Johnson would carry a firearm for protection or intimidation when accompanying him on such deliveries. Based on the record as a whole, the district court did not err in finding that Luster reasonably could have foreseen the possession of firearms by Davis and Johnson. Luster's claim that he could not have foreseen the possession of firearms in Davis's cocaine operation is particularly unpersuasive given that during part of the conspiracy, Luster himself was on home detention for his third conviction for carrying a firearm without a license.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*