In the

# United States Court of Appeals
### For the Seventh Circuit

No. 06-3415

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES BURT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 273—**Wayne R. Andersen**, *Judge.*

ARGUED APRIL 4, 2007—DECIDED JULY 26, 2007

Before KANNE, WILLIAMS, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Charles Burt was convicted by a jury of nine counts: seven counts of sexual exploitation of a minor, one count of distributing child pornography, and one count of possession of child pornography. He challenges a number of the evidentiary decisions by the district court, and argues that the cumulative effect of the errors deprived him of a fair trial. Finding no error, we affirm.

## I. Background

Charles Burt worked in the photography department of the local grocery store. Photography was a hobby and an occasional side business for him. A federal investigation into a child pornography ring led to a search warrant being issued for Burt's house. The warrant was executed, and agents recovered photography and computer equipment from his house. Based on files found on his computer and information recovered from other computers seized in the investigation, as well as testimony from other suspects, the government eventually secured a superseding indictment containing nine counts. The first seven counts were for exploiting children in the production of pornography in violation of 18 U.S.C. § 2251(a). An eighth count charged that he distributed child pornography in violation of 18 U.S.C. § 2252(a)(1)(A). Count nine charged Burt with receipt and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B).

The evidence at trial was more extensive than we need recount here. We will focus on those aspects of the evidence that have been raised by Burt on appeal. The government's case was made up of three categories of witnesses. One group consisted of the agents and officers who investigate child pornography and who had been involved in this case. A second category consisted of some of the children who had been photographed. A third category included William Martin and Brian Urbanawicz, both of whom were in prison for charges related to child pornography or child abuse and had been part of the group of child pornographers whose trail had eventually led to Burt's doorstep.

As part of its case, the government established that photographs of young boys taken by Burt were the "holy grail" among an online community of child pornography traders and admitted pedophiles. Tr. at 198. The govern-

ment called William Martin, who was serving a prison sentence for child pornography in Wisconsin. Martin's computer had contained numerous explicit pictures of children, and a video showing Burt molesting a child. Martin testified about his online relationship with Burt, including trading photos, online chats that both of them had taken part in, and some of the technical details of how Martin had administered one of the internet sites where self-described "boy-lovers" would congregate. Specifically, he testified that the photo which was the basis for count four of the indictment was found on his computer. Tr. at 257-58. He also testified that the internet screen names "BSomeSmoke" and "Starved_Rock" were used by Martin and Burt, respectively.

When the government asked Martin whether Burt had sent him photos of naked boys, he denied it. Over a defense objection, the court allowed the government to ask Martin whether he had ever made prior inconsistent statements when he was being interviewed by federal agents after his arrest. The court admonished the jury that the question was not to be considered evidence, but that evidence comes only from "the witnesses, the documents, and the stipulations." Tr at. 267. Martin denied that he had ever told the investigators that he had received any of his collection of child pornography from Burt.

The government later called two of the investigators from the Martin case. Agent Brelsford testified that Martin had, in fact, previously implicated Burt when he was interrogated about the pornography found on his computer. Over defense counsel objection, the court allowed Brelsford's testimony, which the government elicited with the expressed intent to impeach Martin's denial that Burt was the source of some of his pornography. The court instructed the jury that, on this topic, Brelsford's testimony was only to be considered for the purposes of impeaching Martin's testimony. The court's

limiting instruction to the jury occupies one and one-half pages of trial transcript. Tr. at 402-03. The government later called Agent McDonough, part of whose testimony also impeached Martin's denial that Burt was the source of at least some of his pornography.

During Brelsford's testimony and McDonough's testimony, the government also admitted logs of internet chat conversations between two people. The screen names that were used on the internet chat were "Starved_Rock" and "BSomeSmoke." Over a defense objection, when the government published those transcripts of the chat room conversations, the district court allowed the government to substitute "Burt" and "Martin" in place of the screen names. The district court admonished the jury that they were not to assume that the chat was actually conducted by Burt and Martin, but that the earlier evidence could have allowed them to make that inference, and "whether or not they really authored these statements is something that you will have to conclude." Tr. at 413.

Of the three children who testified against Burt, two made allegations that he had molested them. In the case of one child, David, the act of alleged molestation was captured on video, and this video was the underlying pornography charged in count five of the indictment. In the case of the other child, Austin, no act of molestation was ever charged and none of the alleged pornographic pictures showed Burt molesting Austin.

A defense theme throughout the trial had been that not all nude photos of children are pornographic. In particular, the defense's case went, the government was required in this case to prove that the photographs were "lascivious exhibition of the genitals." 18 U.S.C. § 2256(2)(A)(v). (There are other ways that a photo can count as depicting sexually explicit conduct under the statute, but the parties agree that in this case the government could not prove

them.) In his opening statement, Burt's counsel framed the case as being about "a small town, hardworking professional photographer who took pictures of young boys engaged in sports, sports attire, athletic equipment, for the purpose of putting them on a legitimate nonpornographic website." Tr. at 53. During trial, and outside the presence of the jury, the parties had sparred about whether Burt should be allowed to show the jury pictures of nude boys that could be found in books available in the library. Burt's argument was that the government was required to prove more than just the creation of nude photos. During closing argument, the defense argued various times to the jury that photographs and videos of naked children are not necessarily pornographic. *See, e.g.,* Tr. at 602 ("You can go to a library, you can go to a church, you can go anywhere and see a picture of a boy or a young child with his penis exposed."); Tr. at 604 ("Not every exposure of genitalia is lascivious."); Tr. at 610 ("Just because you see a naked body or a naked child or the genitalia doesn't mean it is lascivious."); Tr. at 610-11 ("You can go to the library and find all sort of pictures that look like Charles Burt's pictures."); Tr. at 612 ("If you find that that is lascivious, you have to find that every single medical picture depicting a child's penis—you would have to find that lascivious as well."); Tr. at 615 (". . . you would have medical doctors, medical schools, you would have all sorts of artists, going to jail.").

The jury returned guilty verdicts on all nine counts. The court sentenced Burt to one hundred years in prison, "a whopper of a sentence." *United States v. Bullock*, 454 F.3d 637, 637 (7th Cir. 2006) ("One hundred years is a long time—one year longer, in fact, than the standard lyrical shorthand for an unimaginably long sentence."). Burt appeals a series of evidentiary decisions by the district court, and argues that their cumulative effect deprived him of a fair trial.

## II. Analysis

### A. The Brelsford and McDonough Testimony

We review evidentiary rulings for abuse of discretion. *United States v. Luster*, 480 F.3d 551, 556 (7th Cir. 2007). Burt argues on appeal that Brelsford's and McDonough's testimony about what Martin said when he was questioned in an earlier investigation was inadmissable hearsay and that the district court abused its discretion in admitting the testimony.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(C). In this case, we conclude that the testimony was offered to impeach Martin, not to prove the truth of the matter asserted. The court was very thorough in warning the jury about the distinction between the two. The issue first arose when Brelsford took the stand. After explaining to the jury that the government intended to impeach Martin's testimony, the court explained to the jury that "those prior statements themselves cannot be used as evidence to prove something." Tr. at 402. Specifically foreshadowing the content of the testimony, the court continued that the government "cannot use what—what Mr. Martin told this agent to prove that Mr. Burt sent the images to Mr. Martin. [The government] would have to have other evidence that was direct, not statements that somebody made outside of court to prove that." Tr. at 403. The court concluded that the testimony "cannot be used by you to prove the truth of what the agent says Mr. Martin said to him." *Id.* The testimony is therefore not hearsay, and falls squarely within the standard use of prior inconsistent statements to impeach a prior witness's credibility. *See* KENNETH S. BROUN, MCCORMICK ON EVIDENCE § 36 (2006). The fact that Martin was the government's witness

is not generally a bar to the government then impeaching him. *See* FED. R. EVID. 607.

Burt argues on appeal that the government improperly called Martin only to provide a backdoor to allow Brelsford's and McDonough's testimony. We have held that "it would be an abuse of the rule, in a criminal case, for the prosecution to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant." *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984). Burt argues that *Webster* has created a "modified version of the primary purpose test" set out in *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975), and cites to *Webster* and *United States v. Kane*, 944 F.2d 1406 (7th Cir. 1991), for support. But neither of those cases makes any mention of a primary purpose. Both cases reiterate that the test is whether the prosecution calls the witness in bad faith. *Kane*, 944 F.2d at 1412 ("The test is whether the prosecution exhibited bad faith by calling a witness sure to be unhelpful to its case."); *Webster*, 734 F.2d at 1192 ("The good-faith standard strikes a better balance . . . .").

Burt is unable to point to any direct evidence that the government acted in bad faith, but argues that because the government knew ahead of time that at least some of Martin's testimony would be adverse to its case, it must have been acting in bad faith. Appellant's Br. at 20 ("[T]he government had no good-faith basis for calling Martin, and even conceded . . . that its purpose was to impeach his testimony."). Burt points to a side-bar discussion in the midst of Martin's testimony, where the government acknowledged that Martin would likely deny aspects of his previous statements and that the government would subsequently call Brelsford and McDonough to impeach Martin on those parts of his testimony. Tr. at 264-67.

But it cannot be that any time the government suspects that a witness will lie on some aspect of his testimony that it is barred from using the witness. *Webster* actually envisioned just the type of situation that we deal with here, and held that the testimony would be admissible:

> Suppose the government called an adverse witness that it thought would give evidence both helpful and harmful to it, but it also thought that the harmful aspect could be nullified by introducing the witness's prior inconsistent statement. . . . [W]e are at a loss to understand why the government should be put to the choice between the Scylla of forgoing impeachment and the Charybdis of not calling at all a witness from whom it expects to elicit genuinely helpful evidence.

*Webster*, 734 F.2d at 1193.

The question for us, then, is whether there is enough useful information in Martin's testimony to support the district court's decision to allow it. Reviewing the transcripts, we conclude that it was well within the district court's discretion to allow Martin's testimony, even knowing that the government would eventually impeach some of it through the testimony of Brelsford and McDonough. In the portion of Martin's testimony that had already been concluded before the questioning turned to his previous statements, the government had already elicited the following information from him: (1) that he was a collector of child pornography and a pedophile, (2) that he was an on-line associate of Burt, (3) that Martin ran a website called "Star Kids" which previous testimony had established was a site where other pedophiles frequently congregated, (4) that his computer, seized in Wisconsin, had included the picture which was the foundation for count four of the indictment, (5) that his computer contained several videos of Burt and other people doing unnamed acts, (6) that Martin's screen name was

"BSomeSmoke" and Burt's was variously "Exsell" or "Starved_Rock," (7) that he and Burt traded photos and videos of children on the internet, (8) that he used computer encryption to hide child pornography, and (9) that he had brought children from Wisconsin to Illinois to have Burt photograph them.

It boggles the mind that Burt would claim on appeal that there was no good-faith reason for the government to call Martin other than to tee up Brelsford's and McDonough's impeaching testimony. The authentication of the count four photo on his computer in Wisconsin was sufficient by itself to support calling Martin. The district court did not abuse its discretion in allowing Martin, Brelsford, or McDonough to testify as they did. The court's curative instructions were more than adequate to ensure that the evidence did not mislead the jury or prove to be more prejudicial than probative.

### B.  The "Starved-Rock" Chat Transcripts

During Brelsford's and McDonough's testimony, the government also published to the jury two exhibits, which are referred to by the parties as the "Starved Rock Chat" and the "Starved Rock Chat Excerpts." Burt did not object to the admission of Starved Rock Chat, but did object to the admission of the excerpts. Tr. at 184, 407-12. Both pieces of evidence were based on a log of a Yahoo! chat between "BSomeSmoke" and "Starved_Rock" which was recovered off of Martin's computer in Wisconsin. Recall that Martin testified that those names referred to Martin and Burt respectively.

Burt now argues on appeal that the admission of the chat as a whole was an abuse of discretion. We disagree. Although we have not considered the question before, other circuits have concluded that properly authenticated chat

logs may be admitted in evidence. *See, e.g.*, *United States v. Tank*, 200 F.3d 627 (9th Cir. 2000); *United States v. Simpson*, 152 F.3d 1241 (10th Cir. 1998). Those portions of the chat which represent Burt's writings were properly admissible as admissions by a party opponent under FED. R. EVID. 801(d)(2). Burt argues that the inclusion of Martin's half of the conversation is inadmissible hearsay, and unduly prejudicial at any rate. The government counters that Martin's half of the conversation is necessary to provide context to Burt's comments, and was not hearsay because it is not offered for the truth of the matter asserted.

Turning first to the question of whether Martin's portion of the chat constitutes hearsay, we are unable to see any way that the chat was being admitted for the truth of the matter asserted. Without delving into all the graphic details that the chat logs depict, we can summarize Martin's contribution to the conversation as follows: he asserts that he is searching for something (presumably a digital photo) that is "not too graphic" for Burt. He tells Burt the name of the file that he had just sent, and that he "better find it . . . don't [w]ant that floating around." He goes on to describe somebody as "way too ummmmmmmmmmmmmmmmmm", "horny all the time an[d] will literally rape me in my sleep" and that "he never really had someoen [sic] do that [before]." Martin then begins a long description about how one of his victims "actually LOVES it . . . I am not talking oral here." He then concludes that "all boys love oral" which he describes as "normal" but that penetration is "not normal."

There is no reason to believe that Martin's statements were introduced for the purpose of proving the truth of the matter asserted in them. The government had no reason to prove the particular sexual activities that Martin engaged in with particular boys whose photos he might have been sharing with Burt. Nor did the government have any

reason to prove the truth of Martin's assertions that one of his victims rapes him in his sleep, or that "all boys love oral" sex but that penetration is not normal. Other than a conclusory statement that the government offered Martin's words for the truth of the matter asserted, Burt's briefs are entirely devoid of any explanation of how the government sought to establish the truth of the statements, or even which statements the government hoped to prove true through Martin's words. In short, Martin's portion of the chat log was not offered for the proof of any matter asserted in them, and therefore was not hearsay.

Burt makes an additional argument with respect to the excerpted chat, which the government had altered to replace the screen names with real names, that another layer of hearsay was added to the exhibit making its admission an abuse of discretion. The parties have not pointed us to any direct authority on this issue, and it appears to be a question of first impression. We are persuaded that the altered chat logs fall into the category of a demonstrative exhibit, making their admission subject to analysis under FED. R. EVID. 403.

We come to this conclusion by considering the altered chat logs in the context for which they were offered, and by analogizing to other more commonly accepted demonstrative exhibits. When the government introduced the excerpts, the prosecutor asked Brelsford to authenticate the excerpts. He replied that it was "a summary, a synopsis, of the chats reflected in the previous Government exhibit." Tr. at 406. After Brelsford clarified that the excerpts were "direct quote excerpts of the overall chats," the government asked, "have you reviewed [the excerpts] and determined that that exhibit accurately transcribes what is portrayed in Government Exhibit Starved Rock Chat?" Id. at 407. Brelsford agreed that, with the exception of two typographic errors which were corrected, "the actual context of the communication is verbatim." *Id*.

The court admonished the jury that they were to inde-
pendently evaluate whether the evidence convinced them
that the screen names were actually used by Martin and
Burt. The court noted that there was evidence that the
screen names corresponded to those individuals, and
warned the jury that "even though [the] exhibit says
Martin and Burt . . . if I advise you that in fact it was
Starved Rock and BSomeSmoke . . . that is what it said."
*Id*. at 412-13. Finally, the court clarified to the jury that
"whether or not [Martin and Burt] really authored these
statements is something that you will have to conclude."
*Id*. at 413. At that point the government led agent
Brelsford through an analysis of the chat logs to clarify
what Martin and Burt had written to each other.

"It is today increasingly common to encounter the use of
demonstrative aids throughout a trial. . . . Demonstrative
aids take many forms; [including] duplicates, models,
maps, sketches and diagrams, and computer-generated
pedagogic aids." KENNETH S. BROUN, MCCORMICK ON
EVIDENCE § 212 (2006). The decision to allow demonstra-
tive aids rests in the discretion of the district judge. *United
States v. Salerno*, 108 F.3d 730, 742 (7th Cir. 1997). We
have previously upheld tapes and a tape player being
brought to the jury deliberation room. *United States v.
Hofer*, 995 F.2d 746, 748-49 (7th Cir. 1993). Likewise we
have upheld a district judge's decision to allow the jury to
handle firearms that were admitted into evidence. *United
States v. Burrell*, 963 F.2d 976 (7th Cir. 1992). In *United
States v. Welch*, 945 F.2d 1378 (7th Cir. 1991), we held it
not to be an abuse of discretion for a district judge to
exclude a proffered transcript of an audio tape that
included extensive editorial commentary on defense
suspicions that the tape showed signs of being edited. In
*Salerno*, we upheld the district judge's decision to admit
into evidence a scale model of a crime scene and to allow

the model to be brought into the deliberation room. 108 F.3d at 742.

We see no reason not to extend the logic of allowing models, maps, sketches, and diagrams to incorporate these particular chat excerpts as well. In this case, the excerpted chat logs were used to aid two witnesses in interpreting and explaining the raw computer chat logs, which forensic examiners had recovered from Martin's computer. Just as a sketch or model of a crime scene can be used to help a witness to recount aspects of testimony and to make that testimony more accessible and understandable for the jury, so might affixing the names of real people in place of their aliases put the computer chat comments into a more useful context for the witnesses and the jury.

Burt argues now that under FED. R. EVID. 403, the chat excerpts with Martin's and Burt's names on them should have been excluded as more prejudicial than probative. Appellee's Br. at 23-24. We give wide deference to the district court in its exercise of discretion to balance prejudicial and probative effects of evidence. *United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995). Burt argues that there was little probative use in the admission of the chat excerpts and the potential for great prejudice. We disagree. Recall that one of the main issues in contention in this case was whether Burt created and traded naked pictures of children for legitimate reasons or for sexual gratification. It was the defense's contention that he had legitimate commercial (non-pornographic) interests in these photos. In that context, an internet chat where Martin and Burt traded photos while making overtly sexual comments had tremendous probative value on one of the only serious points of contention between the government and the defendant.

As for being prejudicial, Rule 403 speaks of "unfair prejudice, confusion of the issues, or misleading the jury."

There is a difference between evidence that brings unfair prejudice and evidence that is damning. If this chat log were being offered in a prosecution for an unrelated crime, we might be more sympathetic to a claim that it could unfairly prejudice a jury. Being associated with the sexual exploitation of children tends to do that. But the point is that in this case Burt was being prosecuted for exactly what this chat log depicts: creating, trading, and distributing photos of children for the sexual satisfaction of himself and his online partners. The chat may well have been damning, but we do not see how it created unfair prejudice. We caution that allowing the government to insert the real names in place of the screen names is a path that a district court should be careful to tread. But the court very clearly instructed the jury about the limited extent to which that substitution of names could be considered by the jury, and we emphasize that in this particular trial nobody seriously contended that this internet chat was conducted by anybody other than Martin and Burt. We find no error in the admission of the raw chat logs or the excerpted chats.

## C. *The Evidence of Austin's Molestation*

Finally, Burt argues that the testimony by witness Austin about Burt's molestation also violates FED. R. EVID. 403. Austin was one of three children called by the government during its case. Unlike witness David, whose molestation was recorded on the video which provided the underlying pornography for one of the counts against Burt, Austin's molestation was not documented in any of the photos that made up the counts against Burt. Burt argues that Austin's testimony was likely to unfairly prejudice the jury in excess of any probative value it might have had.

We need only return to the heart of the defense's case to dispense with this argument. As noted above, Burt rested

much of his case on the theory that his photos were non-sexual. The government bore the burden of proving that the photos were "lascivious exhibition of the genitals" in violation of 18 U.S.C. § 2256(2)(A)(v). The instructions that the judge gave to the jury on how to determine whether nude photos meet that standard included, as one example, "whether the picture or image is intended or designed to elicit a sexual response in the viewer." Tr. at 570.

Rule 404(b) allows the introduction of prior bad acts as proof of "motive . . . intent . . . [or] plan." FED R. EVID. 404(b). Austin's testimony was not simply that he had once been molested by Burt. On the contrary, his testimony established that he was repeatedly molested during the period when the photos in question were being taken. The testimony also established that the molestation happened behind closed (and locked) doors, in the same rooms of the house where the photography sessions were conducted. His testimony was directly relevant to the question of whether Burt was a "hard working professional photographer" taking pictures for a legitimate "non-pornographic website" as the defense had stated in his opening statement, or whether he took pictures of naked children because they "elicit a sexual response" in him or his online partners. We do not believe that the district court abused its discretion in admitting the testimony.

### III. CONCLUSION

The district court did not abuse its discretion in admitting the testimony of Brelsford, McDonough, or Austin. The admission of the chat excerpts as demonstrative aids was within the discretion of the district court, and was properly accompanied by a limiting instruction to the jury. Finding no error, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*