# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-3303 and 05-3336

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHERMAN EMERSON AND WILLIAM E. INGRAM,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 CR 201—**David F. Hamilton**, *Judge.*

---

ARGUED JANUARY 9, 2007—DECIDED SEPTEMBER 7, 2007

---

Before BAUER, RIPPLE, and EVANS, *Circuit Judges.*

BAUER, *Circuit Judge.* Sherman Emerson and William E. Ingram were already known to law enforcement when a confidential informant, Edwin Douglas, contacted Detective Kenneth Martinez of the Indianapolis Police Department in November of 2004 about Ingram's interest in committing "licks" or "drug rips"—robbing drug dealers of their drugs. At that time, Ingram had prior convictions for dealing in a sawed-off shotgun, criminal confinement, receiving stolen property, and intimidation. He and Emerson also had been charged with murder arising from an earlier lick. The Indianapolis Police Department referred the matter to federal authorities,

who launched a sting operation that nabbed Ingram and Emerson, as well as four other individuals. Only Ingram and Emerson proceeded to trial, where a jury convicted them of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1). The jury also convicted Ingram of carrying a firearm in furtherance of a drug-trafficking crime and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 924(c) and 922(g), respectively. Ingram and Emerson appeal their convictions and sentences. We affirm.

## I. Background

### A. The Sting

Posing as a dealer for a cocaine trafficker, Special Agent Carlos Canino of the Bureau of Alcohol, Tobacco, Firearms and Explosives met with Ingram at an Indianapolis hotel on November 19, 2004. The meeting was recorded by video and audio. At the meeting, "Carlos" represented to Ingram that he was branching out on his own in the cocaine-trafficking business and that his boss was sending twenty kilograms of cocaine from Miami to Indianapolis a few weeks later. Carlos invited Ingram, Douglas, who had driven Ingram to the hotel, and others to steal the cocaine: Carlos would receive 10 kilos; the other 10 kilos would go to Douglas, Ingram, and their associates.

Ingram is heard on the surveillance tape discussing his interest in committing the robbery. He also described his plan for the robbery. Ingram explained to Carlos that he would put together a crew of six "killers," who would be armed and wearing masks. Ingram further stated that he carried a "9," or 9 mm pistol, and that he kept 17 shots. He considered the robbery of 20 kilos of cocaine a "lifetime

opportunity," stating that he had been planning such a robbery for over two years. He even informed Carlos that he had committed a similar robbery a week earlier. Before the meeting ended, Ingram agreed to return to the hotel the following night so that Carlos could meet Ingram's associates and they could continue to plan the lick.

Driven by Douglas, Ingram returned to the hotel the following night. Also present for the meeting were Carlos, defendant Emerson, Deandre Douglas ("D. Douglas"), and Roderick Nelson. Like the meeting the previous night, this meeting was monitored and videotaped. For the benefit of everyone present, Ingram described the plan: there were 20 "birds," or kilos, of cocaine; there "would be six of us going in;" and everyone would be masked and armed. They would put the Mexicans on their backs, tie them up, and take the 20 birds. Each person who participated would receive a "bird." He also said that they knew how to do robberies because they had done them before.

Emerson asked when the lick would occur and whether the warehouse in which the cocaine was being stored would be left open. He also expressed concern that he could not participate in the lick because he did not have a "heater," or gun. When Carlos asked if anyone had any questions, Emerson responded, "I'm used to it, I ain't got no questions." Carlos also asked Ingram if those present constituted the team. Ingram replied that there might be one more and that he had wanted to bring his guys to the meeting so that they could meet him, Carlos.

As the meeting was ending, Carlos informed everyone that he was returning to Miami the next day and that he would be back in Indianapolis two weeks later to await the shipment of cocaine. Carlos and Ingram then made arrangements for Carlos to contact Ingram when he returned to Indianapolis.

Between November 20 and December 4, 2004, Douglas recorded conversations between himself, Ingram, and others, including a conversation that occurred on December 2 between himself, Ingram, and Emerson. During this conversation, Ingram informed Emerson that the other participants in the "Carlos robbery" did not want Emerson involved because of statements purportedly made by Emerson that he wanted to kill the Mexicans who were delivering the cocaine. Emerson also had not yet obtained a gun. Ingram told Emerson that he would not be allowed to participate in the lick itself but that he, Emerson, would nonetheless receive some of the cocaine from the lick.

On December 4, Ingram, Douglas, D. Douglas, Daniel Cannon, and Nelson met Carlos at the same hotel. Again, this meeting was monitored and videotaped. The group plotted their final strategy for the robbery. Carlos informed everyone that his cocaine supplier would contact him the next morning with the location of the delivery. He instructed the group that they would follow him to a storage facility to pick up a vehicle and then follow him to the delivery site. Carlos said that he had rented a hotel room at a Lee's Inn that night and directed everyone to stay there that night or to arrive there by early morning so that they would be ready when he received the call from his supplier. He gave Douglas a key to the hotel room.

The following morning, Carlos met Ingram, Douglas, D. Douglas, Mann, Cannon, and Stephan Coleman at the Lee's Inn. They told Carlos that they were ready for the robbery. Carlos led Ingram and the others to a storage facility, where he separated himself from the others and gave an arrest signal. At the signal, Ingram and the others were arrested. Emerson was arrested at his home later.

A search was conducted of the van that Mann had driven with Cannon and Douglas as passengers. The search uncovered four guns, ski masks, and duct tape. Later, Ingram and Mann had a conversation while they were inside a U.S. Marshal Service transport van. Without their knowledge, the conversation was recorded. During the conversation, Mann asked Ingram how many heaters were in the gym bag. Ingram responded, "1, 2, 3, it should have been 3." Ingram also said that he had thrown away a mask and stocking cap once it was apparent that the police were there. He also spoke of having obtained a gun from "Dre," *i.e.*, Mann.

## B. District Court Proceedings

At trial, the government's evidence consisted primarily of Agent Canino's testimony and videotapes of the meetings at the hotel. Over the defendants' objections, the government also introduced the tape of the December 2 conversation between Douglas, Ingram, and Emerson and the recording from the U.S. Marshal Service transport van. Emerson did not testify or introduce any evidence in his defense. Ingram asserted an entrapment defense, claiming that Douglas had coerced him to participate in the robbery. The jury rejected Ingram's defense, finding Ingram and Emerson guilty on the conspiracy count and Ingram guilty of carrying a firearm in furtherance of a drug-trafficking crime and being a felon in possession of a firearm.

At his sentencing, Emerson objected to an upward adjustment of his offense level for possession of a weapon. He argued further that his offense level required a downward adjustment because his role was minor or minimal. Overruling both objections, the district court sentenced Emerson to 327 months of incarceration. At a separate hearing, the district court sentenced Ingram, who qualified

as a career offender, to a total of 660 months of incarceration. Ingram and Emerson filed timely appeals, which we consolidated.

## II. Analysis

Ingram and Emerson raise a number of challenges to their convictions and sentences. Emerson contends that the district court erred in denying his motion for judgment of acquittal, arguing that the government's evidence was insufficient as a matter of law to support his conviction for conspiracy. Both Ingram and Emerson argue that the district court erred in denying their motion for a mistrial after the government elicited testimony from Detective Martinez about their involvement in the earlier drug lick that resulted in a murder. They argue that such testimony, coupled with the district court's failure to give any curative instruction to the jury, deprived them of their right to a fair trial. Ingram and Emerson also argue that the district court erred in admitting the December 2, 2004 recording of the conversation between Douglas, Ingram, and Emerson and the recording from the U.S. Marshal transport van. Separately, Emerson challenges his sentence on the grounds that it was error for the district court to add a two-point enhancement to his offense level for possession of firearms and to decline to reduce his offense level based on his minor role in the offense. Ingram challenges the reasonableness of his sentence. We address each contention in turn.

### A.  Sufficiency of Evidence Against Emerson

Emerson argues that the district court erred in denying his motion for judgment of acquittal because the evidence was insufficient to support his conspiracy conviction. He argues that the evidence instead showed that the mem-

bers of the conspiracy rejected him and that he repudi-ated any further interest in them when confronted by this rejection. Our review of the district court's denial of a motion for judgment of acquittal is *de novo*. *United States v. Romero*, 469 F.3d 1139, 1151 (7th Cir. 2006). Emerson faces an uphill battle in his challenge to the sufficiency of the evidence. This is because "[w]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotations and citations omitted).

Viewing the evidence in this light, Emerson cannot sustain his burden. To prove a conspiracy under 21 U.S.C. § 846, the government must prove "(1) two or more people agreed to commit an unlawful act[;] and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (*quoting United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001)).

The government presented sufficient evidence of Emer-son's involvement in the conspiracy. The videotape of the meeting on November 20 at the hotel in Indianapolis showed Emerson asking questions about the plans for the robbery, *e.g.*, when the lick would take place and whether the warehouse would be open, and voicing his concerns about getting a firearm for the robbery. When Carlos asked if those present in the room constituted the team for the robbery, Ingram said that there might be one more and that he had wanted to bring his guys to the meeting to introduce them to Carlos. He did not exclude Emerson from the team, nor did Emerson exclude himself. To the contrary, Emerson said that he did not have any ques-tions about the robbery in response to Carlos's invitation for questions. In fact, according to Emerson, he was "used to it . . . ."

Even after Emerson was benched by Ingram and not allowed to participate in the actual robbery because of the other participants' concerns that he, Emerson, was trigger happy, he remained a member of conspiracy: he stood to receive a portion of the cocaine recovered during the robbery and did not engage in any overt act to withdraw from the conspiracy. "[W]ithdrawal requires an affirmative act on the part of the conspirator. He must either confess to authorities, or communicate to each of his conspirators that he has abandoned the conspiracy and its goals. . . . Mere inactivity is not sufficient. . . ." *United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995) (internal quotations and citations omitted). There is no evidence that Emerson confessed to authorities or communicated to the other members of the robbery team that he had renounced the goals of the conspiracy. That the other members of the conspiracy did not want Emerson to participate in the actual robbery is not sufficient to constitute withdrawal, particularly where Emerson was to benefit from the proceeds of the robbery. The district court did not err in denying Emerson's motion for judgment of acquittal.

## B.  Evidence of Involvement in Previous Drug Lick

As part of his entrapment defense, Ingram claimed that Detective Martinez had targeted him unfairly and testified to that effect. Ingram testified that he had known Detective Martinez since 2001 and that Martinez was present when Ingram was arrested in connection with the present case. Ingram called Detective Martinez as a witness, asking him how he first came to know Ingram. During cross-examination, the government elicited testimony from Detective Martinez about a murder case arising from a drug lick in which both Emerson and Ingram were charged. While not mentioning Emerson and Ingram

by name, the government's question referenced "two individuals who are in this courtroom" as being charged in connection with that murder case. The charges were dismissed when a key witness "passed away." Ingram and Emerson both objected and moved for a mistrial based on this testimony. The district court overruled their objections and denied their motions, ruling that Ingram's entrapment defense opened the door to this testimony because it was relevant to the issue of his predisposition to commit the crime charged but that such evidence was not admissible as to Emerson. We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Holt*, 486 F.3d 997, 1001 (7th Cir. 2007).

Pursuant to Federal Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith," but may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Before such evidence is admitted:

> the court must determine whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Wilson,* 31 F.3d 510, 514-15 (7th Cir. 1994) (citing cases). Rule 404(b) also allows the government to introduce evidence of other bad acts in order to show predisposition when the defendant raises an entrapment defense. *See United States v. Higham*, 98 F.3d 285, 292 (7th Cir. 1996).

By asserting an entrapment defense, Ingram placed at issue his predisposition to participate in drug licks. *See United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir. 1995) ("The lack of predisposition is the principal element in the entrapment defense."). In doing so, he opened the door to evidence of his prior involvement in drug licks and, specifically, the drug lick that resulted in a murder. *See United States v. Swiatek*, 819 F.2d 721, 728 (7th Cir. 1987) ("Evidence of other bad acts is also admissible to prove predisposition in an entrapment case, because in such a case the defendant's predisposition to commit the charged crime is legitimately at issue."). He first raised the issue of the earlier murder case on Detective Martinez's direct examination, asking Detective Martinez about when he first came to know Emerson. The government followed-up that line of questioning on cross-examination, eliciting the revelation that the previous case was a murder arising from a drug lick. While such evidence was certainly prejudicial to Ingram and his entrapment defense, it was not unfairly so. And other than offering the mere assertion, Ingram has not shown that the district court abused its discretion in finding the evidence sufficient to support a jury finding that he had engaged in the earlier drug lick and murder.

In contrast, evidence of the murder in connection with the drug lick was not admissible as to Emerson because he did not raise an entrapment defense, and the government concedes as much. We conclude, however, that the district court did not abuse its discretion by denying Emerson's motion for mistrial because the error was harmless. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Owens*, 424 F.3d 649, 656 (7th Cir. 2005) (*quoting United States v. Eskridge*, 164 F.3d 1042, 1044 (7th Cir. 1998)). Here, as discussed

above, the record contained ample evidence from which a rational fact-finder could convict Emerson of conspiracy beyond a reasonable doubt. Emerson is seen and heard on videotape participating in the planning of the robbery. The jury also heard a recording of the telephone conversation between Ingram, Emerson, and Douglas in which Ingram informed Emerson that he could not participate in the robbery itself but would nonetheless receive some of the cocaine. Additionally, in its final instructions to the jury, the district court cautioned the jury that it was not to consider evidence of the charges brought and dismissed against Ingram (in connection with the murder) against Emerson at all. This instruction cured any prejudice caused by the reference to the "two individuals" in the courtroom involved in the previous drug lick, as juries are presumed to follow instructions. *United States v. Jones*, 248 F.3d 671, 676 (7th Cir. 2001). We conclude that a rational jury would have found Emerson guilty absent the error.

## C.  Admission of Recordings

Emerson and Ingram challenge the admission of the audio tape of the December 2, 2004 conversation between Ingram, Emerson, and Douglas and the recording of the conversation between Ingram and the other co-conspirators that occurred in the U.S. Marshal transport van. At trial, the district court overruled their foundation objections—the government's failure to authenticate the tapes before offering them into evidence—to the admission of the tapes. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Luster*, 480 F.3d 551, 556 (7th Cir. 2007). Because we give great deference to the trial judge's evidentiary rulings, we will not reverse unless the record contains no evidence on which the trial judge rationally could have based its

decision. *United States v. Gajo*, 290 F.3d 922, 926 (7th Cir. 2002).

"Before a tape recording may be properly admitted at trial, Federal Rule of Evidence 901(a) requires the government to offer 'evidence sufficient to support a finding that the [tape] in question is what its proponent claims.'" *United States v. Eberhart*, 467 F.3d 659, 667 (7th Cir. 2006) (*quoting United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002)). The government satisfies this requirement by offering clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of the conversation between the parties. *Id.* The government may meet this burden by offering evidence establishing the tape's chain of custody or the testimony of an eyewitness that the recording accurately reflects the conversation that he or she witnessed or evidence establishing the chain of custody. *Id.*

With respect to the audio tape of the December 2, 2004 conversation, the government offered the testimony of Detective Martinez. Detective Martinez explained that he gave Douglas a recording device at 8:24 p.m., prior to a meeting with Ingram and Emerson. Detective Martinez testified that he turned on the device before he gave it to Douglas, who did know how to turn the device on or off. Douglas returned the device to Detective Martinez at 10:36 p.m. Detective Martinez stated that he listened to the tape and was familiar with the voices recorded on the tape: Ingram's, Emerson's, and Douglas's. Detective Martinez conceded, however, that he did not personally monitor the communications on the tape as they were recorded and that he could not verify whether the tape had been altered or whether the recorder had been turned off for periods of time while it was in Douglas's possession. Pursuant to an order of the district court, the tape was redacted, resulting in a recording that was shorter than the time period that had elapsed between when Douglas

received the device and when he returned it to Detective Martinez.

It is questionable whether Detective Martinez's testimony alone was sufficient to establish by clear and convincing evidence the authenticity of the December 2 tape recording. In the recent decision in *United States v. Eberhart*, this Court found problematic the admission of an audio tape where the evidence of the tape's authenticity consisted of the testimony of an agent that he had equipped a confidential informant with a recording device before the conversation, that he had removed the recording device after the conversation, and that the voices on the tape were the defendant's and confidential informant's. 467 F.3d at 668. In that case, the court was reviewing the admission of the tape under a plain error standard, concluding that the defendant had failed to show that the error in admitting the tape was obvious and that it affected his substantial rights. *Id.*

In this case, the district court had evidence in the form of Detective Martinez's testimony establishing the location of the recording device, that Douglas did not know how to turn the device on or off, and that the voices on the tape were those of Ingram, Emerson, and Douglas. In light of such evidence, we cannot say that the record was devoid of evidence on which the district court rationally could have based its decision. Additionally, neither Ingram nor Emerson has asserted or provided evidence that the tape was altered or that it is anything other that what it purports to be. We therefore conclude that, because of the deference owed to the district court in reviewing its evidentiary decisions, the district court did not abuse its discretion in admitting the audio tape of the December 2, 2004 conversation. *See United States v. Welch*, 945 F.2d 1378, 1383 (7th Cir. 1991) ("[T]he trial court's ruling on the admissibility of the tape will not be overturned on

appeal absent extraordinary circumstances.") (citations omitted).

We likewise find that the district court did not abuse its discretion by admitting the audiotape of the conversation of Ingram and his co-conspirators that occurred in the U.S. Marshal transport van. Deputy U.S. Marshal John Pappas testified that after he placed Ingram, Mann, D. Douglas, Coleman, and Cannon inside the transport van, he turned on a recording device. The device recorded the conversations of Ingram and the others, including Ingram's comments about the number of guns in the gym bag and his disposal of a mask and stocking cap. Deputy Pappas testified that he did not listen to the conversations as they were recorded. Detective Ron Gray testified that Deputy Pappas gave him the tape at the ATF office later that day, he listened to the original recording and the cassette copy that was made, and there were no alterations or deletions to the tape. Based on this testimony, the district court had some evidence to authenticate the recording and therefore did not abuse its discretion in admitting the audiotape.

Moreover, as discussed previously, the evidence against Ingram and Emerson was overwhelming. To the extent that any error can be ascribed to the admission of the audiotapes, the error was harmless. The recordings of the November 19 and 20 meetings were sufficient to show the existence of a conspiracy to obtain 20 kilos of cocaine and Ingram's and Emerson's membership in the conspiracy beyond a reasonable doubt.

### D. Emerson's Sentence

With regard to his sentence, Emerson challenges the district court's application of a two-level enhancement for possession of a weapon and the denial of a downward

adjustment for his minor role in the offense. Our review of both challenges is for clear error. *See United States v. Luster*, 480 F.3d 551, 557 (7th Cir. 2007) (sentencing court's fact-finding on the weapon's enhancement is reviewed for clear error); *United States v. Sandoval-Vasquez*, 435 F.3d 739, 745 (7th Cir. 2006) (sentencing court's denial of a minor participant adjustment is reviewed for clear error). We find no clear error with regard to Emerson's sentence.

### 1. Firearm Enhancement

Emerson contends that the district court erred in applying a weapons enhancement to his offense level pursuant to § 2D1.1(b)(1), an argument he failed to raise first in the district court. Our review is therefore for plain error, but we find no error here.

"Section 1B1.3(a)(1)(B) makes clear that defendants can also be on the hook for firearms possessed by their co-conspirators so long as such possession was reasonably foreseeable." *United States v. Artley*, ___ F.3d ___, 2007 WL 1598108 n.5 (7th Cir. June 5, 2007) (*quoting Luster*, 480 F.3d at 558). The record was replete with evidence that firearms were involved in the drug lick. Not only was Emerson himself heard on tape expressing his concerns about not being able to obtain a gun in time for the lick, Ingram is heard discussing his 9 mm "heater" and explaining to those present at the November 20 meeting, including Emerson, that everyone would be armed during the robbery. Such evidence established that it was clearly foreseeable to Emerson that his co-conspirators would have firearms in their possession when committing the lick. Based on this record, the district court did not err in applying the two-level firearm enhancement to Emerson's sentence.

### 2. Role in Offense

The Sentencing Guidelines provide for a two-level decrease in offense level when the defendant is a "minor participant" in the offense. *Sandoval-Vasquez*, 435 F.3d at 745. The relevant commentary defines "minor participant" as a defendant "who plays a part in committing the offense that makes him substantially less culpable than the average participant" and "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* A "minimal participant," a defendant who is plainly among the least culpable of those involved, may receive a four-level downward decrease in offense level. U.S.S.G. § 3B1.2 comment (n. 1). The defendant must show by a preponderance of the evidence that he is entitled to either adjustment.

In rejecting Emerson's request for a downward adjustment for his role, the district court explained that while Emerson did not play a leadership or managerial role in the planned robbery, the role that he had agreed to play was neither minor nor minimal: "He agreed to go in and was prepared to go in with a gun, ready to carry out the robbery and ready to use the gun, if needed." The district court also recognized that Emerson was to receive a portion of the cocaine recovered during the lick despite not being allowed to participate in the robbery. He stood to profit from the conspiracy without having to perform the robbery itself, which does not suggest that he was less culpable than the others. In any event, while it is possible that the district court could have found Emerson to be less culpable than his co-conspirators who were seized in the storage facility while attempting the drug lick, the district court did not do so, and Emerson has not shown that this was clear error.

### E. Ingram's Sentence

The district court sentenced Ingram to a total of 660 months' imprisonment: 600 months' imprisonment on the conspiracy count to run consecutively with 60 months' imprisonment on the firearm possession count, plus a concurrent term of 120 months' imprisonment on the felon in possession count. Conceding that his conviction on the conspiracy count qualified him as a career offender under U.S.S.G. § 4B1.1, which put him in an advisory guideline range of 360 months to life, he argues that his sentence does not conform to the sentencing factors specified in 18 U.S.C. § 3553(a). He asserts that his sentence is greater than necessary to comply with the purposes of § 3553(a)(2); that his sentence is disproportionately severe when compared with the average sentence imposed on career offenders sentenced around the country in drug-trafficking cases; and that it is more than is necessary to afford adequate deterrence and to protect the public from him in the future.

Our review of the sentencing court's application of the § 3553(a) sentencing factors is deferential. *United States v. Jung*, 473 F.3d 837, 844 (7th Cir. 2007). "Post-*Booker*, a district court must engage in a two-part sentencing procedure: (1) properly calculate the Guidelines sentence; and (2) consider the sentencing factors set forth in 18 U.S.C. § 3553(a) to arrive at a reasonable sentence." *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007). The district court is not required to make findings as to each § 3553(a) factor; instead, "[i]t is enough that the record confirms meaningful consideration of the types of factors that § 3553(a) identifies." *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006). "[A]ny sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). *See Rita v. United States*, ___ U.S. ___, 127 S. Ct. 2456 (June

21, 2007) (noting that the presumption of reasonableness applies only on appellate review).

In this case, the record shows that the district court considered carefully the § 3553(a) factors, cogently explaining its reasoning for the sentence imposed: "The offense was a conspiracy to possess with intent to distribute and to distribute 20-kilograms of cocaine, to distribute that material in the community where it tears up individual lives, families and neighborhoods . . . . The conspiracy was to go forward and obtain this material with guns." The district court noted that the offense was not even a typical drug distribution conspiracy: "This was a conspiracy to engage in conduct that was far more dangerous to carry out, an armed robbery of victims who in all likelihood would themselves be armed." Had the robbery been what Ingram and his co-conspirators expected, the district court explained, "[c]hances are that this robbery would have launched further retaliation and further violence in the community. . . ."

The district court also explained that Ingram was an organizer and leader of the conspiracy and his long criminal record showed "violence, abuse, bullying of those who are weaker and not armed. They show someone who has no respect for the law, civilization that binds us together, someone who is constantly making threats." Comparing Ingram's sentence with the sentences of the other defendants, the district court recognized that Ingram's sentence was heavier but justified by his role as leader and organizer, his more serious criminal history, and his failure to accept responsibility for his actions, which four of his co-conspirators did. The district court further justified the sentence, explaining that the most important factors in arriving at the sentence were the need to protect the public from future crimes committed by Ingram and the need to deter him and others from future criminal conduct. We are satisfied with the dis-

trict court's consideration of the § 3553(a) factors in imposing Ingram's sentence and will not disturb its ruling.

## III.  Conclusion

For the foregoing reasons, Ingram's and Emerson's convictions and sentences are AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*