In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2259

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DALE RUSSELL,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 08 CR 04—**Sarah Evans Barker**, *Judge*.

ARGUED FEBRUARY 7, 2011—DECIDED NOVEMBER 10, 2011

Before ROVNER and WOOD, *Circuit Judges*, and
GOTTSCHALL, *District Judge*.[*]

ROVNER, *Circuit Judge*. A jury convicted Dale Russell of
producing sexually explicit photographs of his minor
daughters which later crossed international boundaries,
in violation of 18 U.S.C. § 2251(a), and the district court

---

[*] The Honorable Joan B. Gottschall, of the Northern District
of Illinois, Eastern Division, sitting by designation.

ordered him to serve a prison term of thirty-eight years. Russell appeals his convictions, contending that the district court erred in (1) allowing one of his daughters to testify that he had touched her inappropriately one to two years before he took the photographs charged in this case; (2) excluding from evidence a number of photography books from his collection containing photographs of nude families and children, as well as the proffered testimony of an expert concerning the practice of nudism, and (3) instructing the jury that evidence of a defendant's flight from prosecution could be considered as evidence of his consciousness of guilt. Russell also contends that his sentence was unreasonable. We affirm Russell's convictions and sentence.

**I.**

Russell and his wife Dawn Russell (Dawn) divorced in 1998 after eight years of marriage. Dawn was granted custody of their three children, but Russell retained visitation rights and saw them regularly.

Russell had worked for a number of years as a technician at Master Lab, a photography studio in Indianapolis. After he left the company's employ in 1996, he engaged in freelance photography work of his own. Some years later, he began to design and maintain Internet websites for child models. Russell also held a coaching job at Spectrum Gymnastics in the Indianapolis suburb of Carmel.

In mid-October 2004, Dawn learned that photographs of her two daughters, to whom we shall refer as Jane Doe 1

and Jane Doe 2, had been posted on two Internet websites: kasey-model.com and october-model.com. The photographs of Jane Doe 1, born in 1992, included pictures of her dressed in a bra and panties, thong underwear, a swimsuit, and pajamas. Jane Doe 2, born in 1994, had been photographed wearing a bra and panties and a swimsuit. Dawn did not recognize the garments her daughters were wearing in the photographs and had neither authorized nor previously known anything about the websites on which the photographs were posted. The subject was raised at a child support hearing which took place in Indiana family court on October 19, 2004. Russell acknowledged at that hearing that he had taken the photographs of his daughters and ran the two websites on which they were posted. The judge ordered him to shut down both of the websites.

The discovery of the photographs prompted local authorities to commence an investigation of Russell. Although police attempted to track down the websites Russell had created, they were unable to find and access those sites. Eventually, a search warrant for his residence was executed in June 2005, and Russell was questioned. During the interview, Russell admitted having filmed a videotape of his daughters in the nude at a gymnasium. When asked whether he had taken any other nude photographs of his daughters, Russell, according to one of the agents present, said that he did not recall any. (Russell himself would later testify that he refused to answer that question.) No charges were pursued against Russell at that time.

In February 2007, a detective with the Indiana State Police learned that a series of nude photographs of Jane Doe 1 and Jane Doe 2 had been discovered by Canada's National Child Exploitation Coordination Center on a computer belonging to a Canadian citizen. The photographs were sent to the Indiana Internet Crimes Against Children Task Force for investigation. These photographs would later form the basis for federal charges against Russell.

Russell was indicted in 2008 on four charges of producing child pornography in violation of section 2251(a). Count One was based on nine photographs that Russell had taken of Jane Doe 1 on September 6, 2004, when she was twelve years old. The charged photographs were taken in the bedroom that Jane Doe 1 shared with her sister at Russell's residence, and were part of a larger series of eighty-six photographs that Russell took on that occasion. Russell had instructed Jane Doe 1 to pretend she had just awoken from a night's sleep and was rising for the day. The photographs depicted her nude while in bed (although Jane Doe 1 would later testify that she did not normally sleep in the nude), rising from the bed with a blanket around her shoulders, and then putting on a bra and underpants. The bedding, bra, and panties all featured the children's cartoon character Sponge Bob. Jane Doe 1's genital area is visible in all nine of the photographs charged in Count One. Count Two was based on a photo of Jane Doe 1 taken on September 19, 2004 at the Spectrum Gym. The trial testimony revealed that on that date, Russell took his daughters to the gym after hours (he had a key), covered the window of the

front door, and, according to both of his daughters, instructed them to take off their clothes. (Russell denied that he had instructed his daughters to disrobe, testifying instead that it was his daughters' idea.) He took a video of the girls talking about gymnastics, and also took still photographs of each of them. The still photograph charged in Count Two depicts Jane Doe 1 preparing to perform a handstand. She is naked in the photograph, and her genital area is visible. Count Three is based on two photographs taken of Jane Doe 2 at Russell's residence on February 8, 2004, when she was nine years old. Jane Doe 2 is nude in the photos, which depict her having just emerged from the shower. Both photographs depict her with a leg propped up on a toilet that was next to the shower, with a folded towel draped across her leg. Her genital area is visible in both photographs. Finally, Count Four is based on a single photograph of Jane Doe 2 in the mirrored dance room of the Spectrum Gym on September 19, 2004. Jane Doe 2 had turned ten years old by this time. She is standing next to a barre used for warm-up exercises, with her leg extended out to her side. Her genital area is visible in the photograph. Jane Does 1 and 2 would later testify that Russell directed them to assume the poses for all of these photographs. Russell would contradict their testimony on this point, testifying that he had only given them general direction.

Before the trial commenced, it was clear that the central issue in the case would be whether the charged photographs of Jane Does 1 and 2 portrayed "sexually explicit conduct," *see* § 2251(a), which, as relevant here, is

defined to include the "lascivious exhibition of the genitals or pubic area of any person," 18 U.S.C. § 2256(2)(A)(v). Not every nude photograph qualifies as a lascivious one. *United States v. Griesbach*, 540 F.3d 654, 656 (7th Cir. 2008) (coll. cases); *see United States v. Johnson*, 639 F.3d 433, 439 (8th Cir. 2011) (discussing examples of non-lascivious nude photographs). A lascivious display is one that draws attention to the genitals or pubic area of the subject "in order to excite lustfulness or sexual stimulation in the viewer." *United States v. Knox*, 32 F.3d 733, 745 (3d Cir. 1994) (citing BLACK'S LAW DICTIONARY 882 (6th ed. 1990)); *accord United States v. Steen*, 634 F.3d 822, 828 n.30 (5th Cir. 2011) (per curiam). It was Russell's contention that the charged photographs of his daughters depicted nothing more than nudity. R. 29 at 2. By contrast, the government contended that the photographs were intended to elicit a sexual response in the viewer. Both sides sought to introduce evidence extrinsic to the photographs in support of their positions; and each objected to the evidence proposed by the other side.

In his pretrial filings, Russell indicated that he intended to offer a variety of evidence on nudism and nude photography. Russell explained that he and his current wife (he remarried in 2004) were practicing nudists, that they had taken Russell's daughters to nude resorts over the years, and that he had photographed his children in the nude. R. 29 at 1-2. Beyond his own testimony on those subjects, Russell sought to present the expert testimony of Jawn Bauer, an attorney who had served as legal counsel for both national and regional

nudist organizations. Russell contended that Bauer qualified as an expert in view of his "specialized knowledge [of] the nudist sub-culture in America, as well as the core values, philosophy and lifestyle of nudists . . . ." R. 31 at 1. Russell anticipated that Bauer would describe the nudist movement, the demographics of practicing nudists, and the benefits attained by people who embrace the nudist philosophy; that he would "help[ ] the jury to see that nudist resorts and nudist beaches are not simply some haven for sexual perversion"; and that he would "corroborate the defense theory that the charged images portray simple nudity, and were never intended or designed to elicit a sexual response." R. 29 at 8. In support of that defense theory, Russell also sought to introduce into evidence a number of published works of photography containing photographs of nude families and children as evidence of artistic works that had influenced his own photography and to show that he had no intent to create sexually suggestive photographs of his daughters. R. 29 at 7.

The government, on the other hand, sought the admission of evidence that Russell had sexually molested Jane Doe 1 on three occasions, in order to show that the charged photographs were, in fact, meant to excite lustfulness or sexual stimulation in the viewer. The incidents of molestation had taken place one to two years before Russell took the photographs underlying the indictment. Jane Doe 1 had not disclosed these incidents until three weeks before Russell's trial was scheduled to begin; until that time, she had denied repeatedly that her father had ever touched her inappro-

priately. The government contended that Jane Doe 1's testimony concerning these incidents was admissible in its case-in-chief pursuant to Federal Rules of Evidence 414 and 404(b), in order to place the charged photographs in a different light from the one cast by Russell's proposed nudism defense. It reasoned that Russell's "[p]rior sexual contacts with [Jane Doe 1] show his sexual attraction to her, and also show a sexual purpose, therefore, in taking the photographs." R. 77 at 8.

The district court permitted Russell to elicit evidence concerning his practice of nudism, and his inclusion of his daughters in that practice, but excluded his proffered expert along with any evidence related to nude photography and nude photographs other than those he took of his own children. R. 74 at 18. "This case is not about nudism," the court stated. R. 74 at 18. "This is about these photos and the defendant's actions, alleged actions, in creating them, whatever the purpose was . . . ." R. 74 at 18. The court planned to instruct the jury that one of the factors relevant to whether the charged photos reflected a lascivious display of the genitals was whether the display was intended or designed to elicit a sexual response in the viewer. The court agreed that Russell's practice of nudism "may have some marginal relevance" to that factor, although "it does not constitute a defense to this action." R. 74 at 19.

> So with those limitations, you can raise the issue that he is a nudist, and that he participated in those activities, and that he did it with his children, and these pictures that were taken were part of that pattern and not otherwise violative of the statute. That line

you can develop, but you can't create it as a defense in the sense that if other people do it and they think it's all right, then it trumps the jury's decision as to whether these particular depictions are violative of the statute.

R. 74 at 19-20.

As to the prior incidents of molestation, after hearing the government's proffer as to what Jane Doe 1's testimony on this subject would be and why the government believed it was relevant, the court denied without prejudice the government's request to admit the testimony.

The evidence of the sexual acts, the alleged molestations, seems to me to be more remote and less—and therefore less relevant. It's inherently prejudicial, of course, so the Court has to balance very carefully. So the Court will rule that the Government cannot bring out the molestation incidents, the three that were cited to the Court[,] as part of its case-in-chief.

The door may be opened to the inclusion of that evidence on cross-examination of the defendant, depending on how that testimony goes, and also as possible rebuttal evidence depending on what the defense evidence is, if any.

The defendant's not obligated to present any evidence, but if the defense does . . . present evidence on issues that would be—that would make this relevant and relevant as impeachment and relevant as to the charges in the indictment, then it can't come in any other way.

R. 74 at 26.

At trial, Jane Doe 1 testified as a witness for the government. She recalled that her father had taken pictures of her and her sister for as long as she could remember. When she was eleven or twelve years old, her father suggested that he create modeling websites for her, her sister, and her stepsister (the daughter of Russell's second wife) like those he had created for other children in the course of his business. Jane Doe 1 thought the idea sounded like fun. Thereafter, Russell engaged Jane Does 1 and 2 in a series of "photo shoots." Russell would determine a theme for a particular photo session and then choose clothing appropriate to that theme, most of which he provided. In some of the photographs, Jane Doe 1 posed nude or in undergarments (including thong underwear) or swimwear. Russell told the girls that "special people" would pay for expanded access to their websites which would allow them to see the nude photographs. R. 74 at 99-100. Russell paid Jane Doe 1 $20 for some of the photo shoots; Russell told her that she and her sister would also receive money from the websites. On one occasion, Jane Doe 1 accessed her website and saw pictures of herself dressed; she did not know how to access the nude photographs of herself.

Jane Doe 2 also testified at trial. She too recalled that her father routinely took photographs of her and her sister. With respect to the photographs taken for their websites, sometimes the girls were clothed when he photographed them, other times they were partially clothed, and sometimes they wore no clothes at all. Jane Doe 2 acknowledged that her father had asked her if she was okay with him photographing her in the nude and that

she had told him she was. She also acknowledged that she had accompanied her father and his second wife to nudist resorts on more than one occasion and that, when given the choice, she had chosen to be nude, although she did feel "[a] little bit" uncomfortable when she did so. R. 77 at 44.

Russell directed her during the photography sessions: "He would say to do certain poses and stand a certain way." R. 77 at 35. He also provided whatever clothes that she and her sister wore during the photography sessions, including bras, panties, and thong underwear. Although Jane Doe 2 took some of the clothing that Russell provided her home to her mother's house, she did not take the undergarments, "[b]ecause they weren't appropriate and I didn't wear them." R. 77 at 16. Russell paid her $70 for one or more of the photo sessions; she understood this to be money derived from the website her father had set up for her. Russell chose the name "October" for her website. Jane Doe 2 accessed the website on a couple of occasions from Russell's computer, and when she did she saw, among other photographs, pictures of herself in the nude and partially dressed in a bra and panties. She recognized the photos that her mother later saw as being among those posted on the website.

Both Jane Doe 1 and Jane Doe 2 testified that Russell told them not to tell their mother about the websites or about the photo shoot at Spectrum Gym, and according to Jane Doe 1, he also instructed them not to mention the thong underwear he had provided to them for the photo shoots.

Russell took the witness stand in his own defense. He testified that he had been a nudist for virtually all of his life and that his second wife was also a nudist. He was a member of several nudist organizations, had visited nudist resorts fifty to 100 times, and had taken his children to such resorts on ten to fifteen occasions. On those occasions, he had given his daughters the choice whether to disrobe or remain clothed, and they had chosen to be nude.

Russell also testified that he had been taking photographs since the age of eight, and he had been photographing professionally in a freelance capacity since leaving the employ of Master Lab in 1996. He estimated that since 2002 he had probably taken fifty to seventy thousand photographs per year.

Russell said he had started Kid Models, a youth modeling agency, in 1997, and that later evolved into an online enterprise, kidmodelsagency.com, which created websites for child models. He estimated that between 1999 and 2005 he had created approximately twenty-five websites for children ranging in age from five to seventeen years old. In the course of establishing and maintaining a website for a girl who participated in youth beauty pageants, he became aware that one could invite viewers to sponsor a model by paying a fee (say, twenty or twenty-five dollars) in exchange for unlimited access to the model's portfolio of photographs. He later set up each of his daughters' websites so as to provide expanded access to their photographs in exchange for paying a fee to become one of their "sponsors."

According to Russell, he set up the two websites for his daughters after Jane Doe 1 observed him working on the website for the customer who participated in beauty pageants. After discussing the site with her father, Jane Doe 1 asked him if she could have her own site, and he agreed. (This conversation took place early in 2003.) When asked if she too wanted a website, Jane Doe 2 at first said no but changed her mind after observing several of Jane Doe 1's photo shoots. Russell testified that Jane Does 1 and 2 chose the names for their sites. He admitted to taking all of the photographs that his former wife was later shown, as well as photographs of the girls in the nude or in various stages of undress. However, he denied having ever posted any of the nude photographs on the girls' websites. He testified that he took half of the proceeds received from site "sponsors" and deposited them into the girls' bank accounts; the other half he gave to the girls directly for them to spend or save as they wished. He denied, however, that he ever paid the girls directly for any of the photo shoots, nude or otherwise. He also denied having ever told the girls not to tell their mother about the sites, although as far as he knew his ex-wife did not know about them.

Russell acknowledged having taken each of the photographs charged in the indictment, as well as additional, non-charged photographs taken in the same photography session as the nine photographs charged in Count One.[1]

---

[1] He did, however, maintain that someone other than himself had cropped the photographs in Count One to eliminate much
(continued...)

He also admitted taking a videotape of his daughters in the nude at Spectrum Gym on the same occasion that he took the still photos charged in Counts Two and Four, although Russell averred that it was his daughters' idea to take their clothes off on that occasion, not his. Russell acknowledged that he set the themes for his daughters' photography sessions but, when questioned about a number of the photographs, denied that he directed the poses his daughters had assumed in those pictures. He contended that there was nothing inappropriate about any of the photographs and denied that any of them were meant to be sexually suggestive, although he agreed that the nude photographs would not be appropriate for online viewing by the general public.

At the conclusion of Russell's direct examination, the government asked the district judge to reconsider her ruling barring any evidence that Russell had previously engaged in inappropriate sexual contact with Jane Doe 1. In the government's view, Russell's testimony regarding his own practice of nudism and his denial that he had any intent to create sexually suggestive photographs opened the door to contrary proof that the charged photographs were indeed intended or designed to elicit a sexual response in the viewer and therefore qualified as lascivious displays of the genitals or pubic area, and thus "explicit sexual conduct," for purposes of section 2251(a). Evidence that Russell had sexually molested his daughter

---

[1] (...continued)

of the surroundings and effectively enlarge the depictions of Jane Doe 1.

would suggest that he was a pedophile and, contrary to his testimony, that his purpose in photographing his daughters was to create photographs that would appeal to the prurient interests of the persons who would view the photographs.

Russell's counsel responded that Russell's motive and intent were not at issue in the case. The only element of section 2251(a) that was in dispute was whether the images rose to the level of a lascivious exhibition of the genital or pubic area and, in counsel's view, the charged photographs spoke for themselves in terms of their content. Russell's testimony regarding his practice of nudism was not presented as a defense on that point, his counsel argued, but rather had been offered to place the nude photographs he took of his daughters in context and to shed light on who he was as a person: "His personal background to dispel the image that the Government has tried to portray that all he's ever done is take pictures of nude children. It's to give the jury a fair portrait of who my client is, and who he is, all of that, is relevant for the jury's consideration." R. 77 at 182. Against that backdrop, the prior acts of alleged molestation were not relevant to anything that the defense had placed in issue. Alternatively, any probative value that the molestation evidence might have was grossly outweighed by the prejudicial impact of the evidence, which counsel asserted would be "devastating" to the defense. R. 77 at 181; *see also* R. 74 at 14.

The court concluded that Russell had opened the door to the evidence. The court recognized the "inherently

problematic," *i.e.*, prejudicial, nature of the evidence and its potential to distract the jury from the task of assessing whether the charged photographs violated the statute. R. 77 at 190.

> On the other hand, the defense has, through its direct examination of the defendant, portrayed the defendant as a person who is a professional photographer who engages in recreational activities that include nudism, and has taken his family, and in particular the two girls who were involved in this case, with him on those trips, suggesting that the family and he, in particular, has a different view of nudism than others might have, and a higher level of tolerance of that sort of display of the body. And that while it may not be everybody's shared interest, it's his, and it puts in context what he was doing when he photographed the children; that is to say, that what the jury would conclude based on his testimony and based on his theory of defense is that there was nothing inappropriate about it. He said that, in fact, [there was] nothing inappropriate about the photographs or—either the photographs or taking the pictures.

> That suggests that the Government's evidence that there may be something else going on here, and that is, the defendant's sexual interest in his daughters, and that in part his photography was a reflection of that interest; to that extent, the door has been opened for the Government to suggest that, in conjunction with the photography that was occurring by the

> defendant, there were some instances of sexually-related or inappropriate sexual contact with the girls.

R. 77 at 190-91.

Although the court allowed the government to inquire into this area, it imposed strict limits on the questions that the government could ask in order to minimize the potential for undue prejudice to the defense. The court allowed the government to ask Russell on cross-examination whether he had ever had sexual contact with Jane Doe 1. If, as expected, Russell answered that question in the negative, the court would allow the government to ask Jane Doe 1 in the government's rebuttal case whether Russell had ever touched her inappropriately, without eliciting any details about the incidents. Russell's counsel in turn would not be permitted to cross-examine Jane Doe 1 about any such details, although the court would permit the defense to establish that Jane Doe 1 had previously denied that her father had touched her inappropriately and had only recently recanted those denials and disclosed the prior incidents.

As expected, Russell denied on cross-examination that he was sexually attracted to Jane Doe 1 or that he had ever touched his daughter inappropriately, and in the government's rebuttal case Jane Doe 1 was called to testify and answered "yes" when asked if, between 2001 and 2004, her father "did any inappropriate sexual touching or contact" with her. R. 79 at 24. Russell's lawyer then established on cross-examination of Jane Doe 1 that she had only disclosed that information three weeks prior to trial and until that time had repeatedly denied any inap-

propriate touching by her father. Consistent with the limitation imposed by the district judge, neither party elicited any of the details concerning the prior acts of molestation, including how many such acts there had been. In its final jury charge, the court, consistent with Rule 404(b), limited the jury's consideration of these acts to Russell's motive, intent, identity, or absence of mistake or accident. R. 40 at 26; R. 79 at 108 (Instruction No. 18).

Also in its final charge to the jury, the court gave the following instruction identifying various factors that the jury could consider in determining whether the charged photographs reflected "lascivious exhibition of the genitals or pubic area of any person." These factors derive from the district court's opinion in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *judgment aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987), which have since been referenced by a number of circuits.

> Those factors include, but are not limited to: (1) whether the focal point of the picture is the minor's or other person's genitalia; (2) whether the setting or pose is customarily associated with sexual activity; (3) whether the minor's pose is unnatural given his or her age; (4) whether the minor is fully or partially nude; (5) whether sexual coyness or willing-ness to engage in sexual activity is suggested; (6) whether the visual depiction is intended or de-signed to elicit a sexual response in the viewer.

> The government is not required to prove that each of these factors is present. The importance which you

give to any one factor is up to you to decide. The question is whether there is a visual depiction that amounts to a "lascivious exhibition of the genitals or pubic area" of a person.

The word "lascivious" is defined as "of or marked by lust" or "exciting sexual desires." The term "lascivious exhibition" means a depiction which displays or brings to view to attract notice to the genitals or pubic area of children in order to excite lustfulness or sexual stimulation of the viewer. Not every exposure of the genitals or pubic area of children constitutes a lascivious exhibition.

In deciding whether the government has proven that the defendant acted for the purpose of producing a visual depiction of sexually explicit conduct, you may consider all of the evidence concerning the defendant's conduct.

R. 40 at 13-14; R. 79 at 101-02 (Instruction No. 8).

Apart from those factors, one aspect of Russell's conduct that the government believed was relevant to the assessment of his guilt was his relocation from the United States to Mexico in the summer of 2007. Russell and his wife left the United States shortly after a meeting that he and his attorney had with representatives of the U.S. Attorney's office in July 2007. During that meeting, he had been shown copies of the photographs that were later charged in Counts One through Four and was told that the government was contemplating criminal charges. Russell had become aware two years before this meeting that he was under investigation, when

he was served with a search warrant at his home and was questioned about the videotape of his daughters at the gymnasium and asked whether he had taken other photographs of his daughters in the nude. But it was during the 2007 meeting that he was advised that prosecution for the images referenced in Counts One through Four was, in Russell's words, "a possibility." R. 77 at 209. The government argued, and the district court agreed, that Russell's decision to leave the country shortly after that meeting supported an inference that Russell was fleeing the country to avoid prosecution, and that his flight in turn was evidence that he was conscious of his guilt. Over a defense objection, the government was allowed to establish on cross-examination of Russell that he knew criminal charges were a possibility as a result of the July 2007 meeting, and that he and his wife left the country a short time later.[2] Although the court granted the defense permission to elicit any additional testimony that would cast Russell's departure in a more favorable light, it chose not to inquire of Russell or any other witness on this subject. In its final instructions, the court advised the jury that:

> The intentional flight by a defendant immediately after he is accused of a crime that has been committed is not, of course, sufficient in itself to establish his guilt; but it is a fact which, if proved, may be considered by the jury in light of all of the

---

[2] Subsequently, in late 2009, the Mexican authorities put Russell on a plane to Los Angeles, where he was arrested at the airport.

other evidence in the case in determining guilt or innocence.

R. 40 at 32; R. 79 at 110 (Instruction No. 24). In its closing arguments, the government characterized Russell's departure for Mexico as a flight from potential prosecution and thus as evidence of his consciousness of guilt. R. 79 at 56, 79.

The jury convicted Russell on all four counts of the indictment. At sentencing, the district court heard testimony that the images charged in Russell's indictment had been discovered in the possession of 1,567 different individuals located in all but one State of the United States, as well as in Canada and France, between May 2006 and May 2010. There was no evidence that these images had been distributed via Russell's computer or, apart from his daughters' testimony, that he had ever posted the nude photographs on his daughters' websites. But investigators had learned that in 2004, around the time the existence of the websites came to the attention of Dawn Russell and the authorities, Russell gave a box of materials, including hard drives, the gymnasium videotape, and compact discs, to a friend in Michigan for safekeeping. That individual revealed that he had accessed and copied the images on the hard drives, which included photographs of Jane Does 1 and 2 partially or completely naked, and distributed those photographs to others, although he claimed he did not post them on any Internet websites. Also at sentencing, Jane Doe 1 retook the witness stand to recount the details of the three occasions on which her father had

touched her inappropriately. Victim impact statements from Jane Doe 1, Jane Doe 2, and their mother were read aloud.

The Sentencing Guidelines specified a sentence of life in prison for Russell. The government asked the court to impose a term of eighty years. Russell's counsel did not recommend a specific term, but suggested that a term of fifteen to eighteen years would be "a very substantial sentence." R. 81 at 94.

In passing sentence, Judge Barker acknowledged that she had seen more egregious examples of child pornography than the photographs in this case but added that these photographs were "bad enough without being the worst of the worst," R. 81 at 118. Russell had not only victimized his children by taking the photographs, but in view of their widespread distribution to other pedophiles, the injury was repeated ad infinitum. "And you can't change that. You can't pull that back. You can't put that genie back in the bottle. That's harm done that gets multiplied over and over again." R. 81 at 118. The court concluded,

> [W]e have to deter you. We have to deter others. We can't run the risk that you'll ever do this again, but I don't think that I need to deter you as much as I need to deter others. You need to be punished, and so there will be punishment in this sentence.

R. 81 at 118. The district court ordered Russell to serve concurrent terms of 240 months each on Counts 1 and 2 of the indictment, and concurrent terms of 218 months each on Counts 3 and 4, to be served consecutively to

the sentences on Counts 1 and 2, for a total prison term of 456 months, or thirty-eight years.

## II.

### A.  Admission of Prior Acts of Molestation

Russell first challenges the district court's decision to allow Jane Doe 1 to testify that he had touched her inappropriately. He contends that the prior incidents of touching "were not probative of any material fact, were remote in time and dissimilar in nature to the charged offenses and their prejudicial impact far outweighed any arguable probative value." Russell Br. 11. For the reasons that follow, we conclude that the district court did not abuse its discretion in allowing this evidence.

We begin with the statute pursuant to which Russell was charged. In relevant part, section 2251(a) provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of pro-ducing any visual depiction of such conduct . . . shall be punished . . . if such person knows or has reason to know that such visual depiction will be trans-ported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or trans-ported in or affecting interstate or foreign commerce by any means, including by computer, or if such

visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a). As we have noted, "sexually explicit conduct" is defined to include, among other acts, the lascivious display of one's genitals or pubic area. 18 U.S.C. § 2256(2)(A)(v). Thus, when a photographer persuades or induces a minor to pose for a photograph in such a way that she lasciviously displays her genital or pubic area, he violates the statute, assuming there is the requisite link to interstate or foreign commerce. In this case, the subsequent discovery of the charged images on a computer in Canada, as well as Russell's use of a camera that had been manufactured in Japan to produce the charged images, demonstrated sufficient links to interstate or foreign commerce. There was no dispute that Jane Does 1 and 2 were minors, and the defense essentially conceded that Russell had persuaded, induced, or enticed them to be photographed in the nude. The sole question for the jury was whether the charged photographs reflected sexually explicit conduct.

The statute does not define what constitutes a lascivious display of the genitals or pubic area. Generally speaking, as we noted earlier, a lascivious display is one that calls attention to the genitals or pubic area for the purpose of eliciting a sexual response in the viewer. *United States v. Knox*, *supra*, 32 F.3d at 745; *United States v. Steen*, *supra*, 634 F.3d at 828. And, as we have also noted, more than nudity is required to render a photograph lascivious;

rather, "the focus of the image must be on the genitals or the image must be otherwise sexually suggestive." *United States v. Griesbach, supra*, 540 F.3d at 656 (coll. cases). Beyond that, no settled test has emerged in the more than forty years since section 2251 was enacted to ascertain what renders a photo sexually suggestive so as to be deemed lascivious. Instead, the question is left to the factfinder to resolve, on the facts of each case, applying common sense. *See United States v. Frabizio*, 459 F.3d 80, 85-86 (1st Cir. 2006).

As we have also noted, the jury in this case was instructed to consider the factors articulated in *United States v. Dost, supra*, 636 F. Supp. at 832, which include the following:

(1) whether the focal point of the picture is the minor's (or another person's) genitalia;

(2) whether the setting or pose is customarily associated with sexual activity;

(3) whether the minor's pose is unnatural given his or her age;

(4) whether the minor is fully or partially nude;

(5) whether sexual coyness or willingness to engage in sexual activity is suggested; and

(6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

R. 40 at 13-14; R. 79 at 101-02 (Instruction No. 8.) These factors have been approved, to a limited degree, by a number of circuits. *See, e.g., United States v. Rivera*, 546

F.3d 245, 250-53 (2d Cir. 2008); *United States v. Grimes*, 244 F.3d 375, 380 (5th Cir. 2001); *United States v. Horn*, 187 F.3d 781, 789 (8th Cir. 1999); *United States v. Amirault*, 173 F.3d 28, 31-32 (1st Cir. 1999); *Knox*, 32 F.3d at 745-46 & n.10. However, as the First Circuit noted in *Frabizio*, 459 F.3d at 88-90, the adequacy and application of these factors have been the subject of considerable discussion among the courts. *See also Steen*, 634 F.3d at 828-29 (Higginbotham, J., concurring). This court has held that it is not plain error to instruct a jury on the *Dost* factors, *United States v. Noel*, 581 F.3d 490, 499-500 (7th Cir. 2009), but we have otherwise abstained from endorsing them or rejecting them, *id.* at 500. Neither party to this appeal has questioned the propriety of these factors, and we note that the district court quite properly admonished the jury that it was not confined to these factors in its evaluation of the charged photographs, that the government was not required to prove that each of these factors was present, and that it was for the jury to decide the importance of any one factor. R. 40 at 13-14; R. 79 at 101-02 (Instruction No. 8). In the absence of any argument to the contrary, we are satisfied that the jury was given adequate and accurate guidance in assessing whether the charged photographs reflected a lascivious exhibition of the genitals or pubic areas of Jane Does 1 and 2.

Although the primary focus in evaluating the legality of the charged photographs must be on the images themselves, *see, e.g., Griesbach*, 540 F.3d at 656; *Amirault*, 173 F.3d at 31, the cases reveal that the intent and motive of the photographer can be a relevant consideration in evaluating those images. For example, although it is the

sexually suggestive nature of a photograph of a minor which distinguishes a depiction of simple nudity from a lascivious exhibition of the genitals, *Griesbach*, 540 F.3d at 656, children typically are not mature enough to project sexuality consciously; instead, as the Ninth Circuit has pointed out, it is often the photographer who stages the picture in such a way as to make it sexually suggestive. *United States v. Arvin*, 900 F.2d 1385, 1391 (9th Cir. 1990). This Circuit held in *United States v. Burt*, 495 F.3d 733, 741 (7th Cir. 2007), that prior acts of molestation were admissible to show that the defendant was not simply a legitimate photographer who happened to have taken non-sexual photographs of nude children, as his counsel suggested in his opening statement, but rather had deliberately created sexually suggestive photographs that were meant to elicit a sexual response in the viewer. *Burt* illustrates one way in which the photographer's motive or reason for creating an image can be a relevant factor for the factfinder to consider in deciding whether that image reflects mere nudity or a lascivious display of the genitals. In a like vein, the sixth *Dost* factor asks whether the charged image was "intended or designed" to elicit a sexual response in the viewer, and although certain aspects of the image itself will often speak to that question (for example, the setting, and the pose assumed by the minor and any other persons depicted), the photographer's state of mind may also inform this assessment. *See id.* (noting that the jury was instructed on this same factor).

This is simply to say that a defendant's intent or motive in creating an image are *potentially* relevant considera-

tions, as the Ninth Circuit said in *Arvin*, 900 F.2d at 1391. The relevance of a defendant's motive and intent will turn on the facts of the case. But at least in some circumstances, evidence of motive and intent will help to place an image in context, especially where, as here, there is evidence that the photographer posed the minor in such way that her genitals are visible but has disclaimed any intent to create a sexually suggestive image.

On that very point, we note that Russell's attorneys themselves originally cited the sixth *Dost* factor as a reason why the full range of testimony and other evidence that he proposed on nudism should be admitted into evidence:

> Another factor the jury will be invited to consider in determining whether the images depict "lascivious exhibition of the genitals" is whether the visual depiction is intended or designed to elicit a sexual response.
>
> . . . In one breath, the government expresses its intent to introduce allegations of prohibited sexual contact between Defendant and Jane Doe 1 as "highly probative to the issues of [Defendant's] intent and motive in taking the pictures." Govt. Trial Brief, p. 3. In the next breath, they ask this Court to rule that Defendant's views toward nudity and the art that influenced his photography be barred as "confusing to the jury." Precluding such evidence keeps the jury in the dark as to precisely that which the government admits is crucial: Defendant's state of mind. The government cannot have it both ways.

R. 29 at 6-7 (citation omitted).

Although Russell's counsel later abandoned this position and insisted that his state of mind was wholly irrelevant to the jury's evaluation of the photographs, our review of the record leads us to conclude that the district court did not abuse its discretion in concluding that the defense opened the door to evidence bearing on his motive and intent, regardless of whether such evidence was relevant in the first instance. As we understand Russell's defense, one of the reasons why Russell testified about his own practice of nudism was to establish that he viewed nudity as a perfectly natural, normal, and wholesome state of being—far less unusual, evocative, and suspect than others might consider it to be. And when Russell testified that his daughters had attended nude resorts with him and his wife and had joined him in the practice of nudism, he evidently did so in order to suggest that it was not at all unusual or suspect for his daughters to be nude in settings where other people would be clothed. Similarly, when Russell testified that he took many thousands of photographs annually, among them many photographs of his daughters, both nude and clothed, the point of his testimony was to suggest that there was nothing unique or suspect about him taking photographs of his daughters in the nude. This, we surmise, was the "background" and "context" that Russell meant to establish with his testimony about nudism—that to be nude, to be seen in the nude, and to be photographed in the nude in settings where prevailing social norms would expect one to be clothed—is not necessarily meant to convey a sexually provocative message.

Apart from the testimony regarding nudism, Russell made certain assertions during his own testimony, and his counsel asked certain questions in cross-examining Russell's daughters, that also placed into question his state of mind in taking the charged photographs. First, when Russell was questioned on cross-examination about the video and photographs he took of Jane Does 1 and 2 at the gymnasium, he maintained that it was his daughters' idea to take their clothes off. R. 77 at 199, 230. His testimony on this point directly contradicted the testimony of Jane Does 1 and 2, who said that it was their father who told them to disrobe, R. 74 at 101; R. 77 at 33-34, and if Russell's testimony is credited it would suggest that he, at least on that occasion, was indifferent to whether the girls were nude. Second, and as we mentioned earlier, when Russell was cross-examined about a number of the nude photographs he took of his daughters, he denied that he had directed the girls to assume any particular pose. For example, when asked about the photographs underlying Count Three, depicting Jane Doe 2 just emerged from the shower, Russell testified, "I did not stage the scene, no." R. 77 at 225. *See also* R. 77 at 217-223. Again, his testimony on this subject was contrary to that of his daughters, *see, e.g.,* R. 74 at 111, 126; R. 77 at 30, 35, and it suggested that Russell was not directing the girls to pose in ways that could be viewed as sexually suggestive. Finally, during the cross-examination of Jane Does 1 and 2, Russell's counsel sought to establish that Russell had not directed the girls while photographing them in the nude in any different way than he had when photographing them clothed. R. 74 at

120; R. 77 at 55-56. Those questions were clearly aimed at conveying to the jury that Russell's purpose in photographing his daughters nude was not to create sexually suggestive images.

Given all of this, we agree with the district court that the door was opened to evidence that would cast a different light on Russell's motive and intent in taking the charged photographs. Russell may have a point when he emphasizes that he "structured his case in compliance with the court's decision [to initially exclude the molestation evidence] and with its prior holdings that he was entitled to testify to the fact that he practices nudism, that he has included his children in nudist activities and that his photographs were part of that pattern and not otherwise violative of the statute." Russell Br. 16. Although rendered separately, the district court's pre-trial rulings allowing him to testify on the subject of nudism, while barring evidence of the prior acts of inappropriate touching, seemed to envision that Russell could testify that the charged photographs were consistent with his own practice of nudism and his daughters' participation in nudist activities and that the photos were not inappropriate, sexually charged images, without opening the door to evidence that he had previously touched Jane Doe 1 inappropriately. But in retrospect, we doubt that there was any way in which Russell could have testified as envisioned on the subject of nudism without calling into question his purpose and motive in taking the charged photographs. Although defense counsel repeatedly characterized Russell's testimony on this subject as mere "background" and "context," it was

necessarily meant to explain how and why Russell could be posing and photographing his daughters in the nude without intending or understanding the resulting photographs to be sexually explicit images. This is the only sense in which the testimony about nudism could possibly have been relevant—to the extent it was relevant at all—and to our mind it necessarily opened the door to other evidence bearing on Russell's motive and purpose in creating the charged images. In any case, the district court could not know to what extent Russell might be placing his state of mind in issue until it heard the testimony elicited by the defense on the subject of nudism. By eliciting testimony not only that the photographs were consistent with the practice of nudism by Russell and his daughters, that he took many photographs of his daughters both clothed and in the nude, that in the case of the photographs taken at the gymnasium, it was his daughters who chose to be naked, that some of the poses his daughters assumed when photographed without clothes were not his doing, and that, to the extent he did give his daughters direction when photographing them in the nude, he did so in the same manner as he did when they were clothed, and that he believed there to be nothing inappropriate about the photographs, the defense did much more than elicit generic evidence as to his background and character. The defense undeniably sought to suggest that Russell had no motive or intent to create sexually provocative photographs of his daughters.

We note that the government relied on both Rule 404(b) and Rule 414 of the Federal Rules of Evidence in seeking

the admission of the molestation evidence. Rule 404(b), of course, allows evidence of a defendant's "other crimes, wrongs, or acts" for purposes other than to show the defendant's propensity to commit the charged offense, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 414, which applies to cases in which the defendant is accused of "an offense of child molestation"—defined broadly to include the types of sexual exploitation proscribed by section 2251(a), *see* Rule 414(d)(2)—authorizes the admission of evidence that the defendant has committed other acts of child molestation "for its bearing on *any* matter to which it is relevant," including a defendant's propensity to commit the charged offense. Rule 414(a) (emphasis supplied).

In this case, however, the court appears to have relied on Rule 404(b) alone in admitting the molestation evidence, as it gave an instruction advising the jury that it could consider this evidence "only on issues of motive, intent, identity, or absence of mistake or accident in reference to the offenses charged in the indictment." R. 40 at 26; R. 79 at 108 (Instruction No. 18). As we believe the molestation evidence was relevant to Russell's motive and intent in taking the charged photographs, we agree that Rule 404(b) supported the admission of this evidence.

Russell contends that because this evidence related to alleged acts of molestation, which obviously were different from the charged offense of creating and distrib-

uting child pornography, the evidence was inadmissible. But a prior act need not be the same as the charged offense in order to be relevant under Rules 404(b) or 414. *See, e.g., United States v. Tylkowski*, 9 F.3d 1255, 1261 (7th Cir. 1993). Indeed, we recognized in *United States v. Sebolt*, 460 F.3d 910, 917 (7th Cir. 2006), that where a defendant is charged with an offense involving child pornography, prior acts of molestation can be relevant to his motive. The defendant in *Sebolt* was charged with, among other offenses, advertising child pornography online, in violation of 18 U.S.C. § 2251(d)(1)(A). At trial, the district court admitted evidence that he had molested, and attempted to molest, multiple minors (including one of his relatives). We deemed that evidence relevant and admissible under Rule 404(b) because it was "strong evidence of his motive to advertise child pornography online." *Id.* at 917. "Prior instances of sexual misconduct with a child victim," we reasoned, "may establish a defendant's sexual interest in children and thereby serve as evidence of the defendant's motive to commit a charged offense involving the sexual exploitation of children." *Id.* (citing *United States v. Cunningham*, 103 F.3d 553, 556 (7th Cir. 1996)); *see also United States v. Rogers*, 587 F.3d 816, 821 (7th Cir. 2009) (repeating the same point). We acknowledged that "[t]he motive to molest children does not completely overlap with the propensity to possess, transport, or advertise child pornography." *Sebolt*, 460 F.3d at 917. Yet, "the conceptual gap between molestation and child pornography is not so wide as to 'induce the jury to decide the case on an improper basis . . . rather than on the evidence

presented.'" *Id.* (quoting *United States v. Thomas*, 321 F.3d 627, 730 (7th Cir. 2003)). *Sebolt* disposes of Russell's argument on this point.

Although the incidents of inappropriate touching were removed in time from the creation of the charged photographs by one to two years, we do not agree with Russell that these acts were so temporally remote as to deprive the acts of touching of their relevance. The passage of one to two years might well render a defendant's prior acts non-probative in another case, but we are not convinced that was true here, given the purpose for which they were offered. *See, e.g., United States v. Julian*, 427 F.3d 471, 487-88 (7th Cir. 2005) (defendant's sexual assault of minor twelve years prior to charged offense of conspiring to travel in foreign commerce with intent to engage in illicit sexual conduct supported inference that defendant was a pedophile and was therefore probative of his knowledge and intent vis-à-vis resort for pedophiles he and co-defendant established); *United States v. Saunders*, 166 F.3d 907, 917 & n.14 (7th Cir. 1999) (portion of threat letter sent to judge, referencing defendant's stabbing of correctional officer some eighteen months earlier, was probative of defendant's intent to instill fear in his victim). The inference that the government wished the jury to draw from Jane Doe 1's testimony that her father had touched her sexually was that Russell is a pedophile. We agree, as the district court did, that her testimony supports that inference. *See Julian*, 427 F.3d at 488. And that inference in turn supports the government's theory that Russell enticed and persuaded his daughters to pose in the nude for the

purpose of creating sexually suggestive photographs that he could sell to or otherwise share with other pedophiles on the Internet. That the inappropriate touching Jane Doe 1 reported had occurred one to two years before Russell photographed his daughters did not defeat that inference or render it less plausible. Pedophiles do not suddenly stop being pedophiles. *See, e.g., Pessimism About Pedophilia*, 27 Harvard Mental Health Letter No. 1, at 1 (July 2010) ("Like other sexual orientations, pedophilia is unlikely to change."); Ryan C. Hall, M.D. and Richard C. Hall, M.D., *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 465 (April 2007) ("[T]the urges can be managed, but the core attraction does not change."). Even if Russell had not molested either of his daughters in the intervening year or two, it is highly unlikely that his desire to engage in sexual contact with them or with other young girls had suddenly dissipated in that period of time.

Russell also contends that Jane Doe 1's testimony on this subject was "devastating" to his defense, but in view of the strict limits that the district judge imposed on this testimony, we do not believe it was so unduly prejudicial as to require its exclusion. The jury knew nothing other than that Russell, according to Jane Doe 1, had touched her inappropriately. It knew none of the particulars, including how many incidents of touching there had been. Consequently, although the jurors knew enough to draw the inference that Russell was sexually interested in Jane Doe 1 and had touched her in a sexual way, it

knew none of the disturbing and inflammatory details that Jane Doe 1 had recounted to the prosecution. The district court thus did everything it could to cabin the prejudicial impact of the testimony by limiting Jane Doe 1's testimony to the one point that was relevant: her father had touched her inappropriately.

By contrast, the district court did give Russell's counsel appropriate leeway to explore on cross-examination of Jane Doe 1 the belated nature of her disclosure of the molestation. Given that Jane Doe 1 had previously (and repeatedly) denied any sexual contact between her father and herself, and then reported the incidents only weeks before the trial commenced, it is possible, as Russell suggests, that her testimony was fabricated. But given how traumatic sexual molestation is, it is by no means unusual for a child to deny that her parent has abused her when, in fact, he has. *See, e.g.*, Leadership Council on Child Abuse & Interpersonal Violence, *Eight Common Myths About Child Sexual Abuse*, http://www. leadershipcouncil.org/1/res/csa_myths.html (last visited Nov. 7, 2011) ("Contrary to the popular misconception that children are prone to exaggerate sexual abuse, research shows that children often minimize and deny, rather than embellish, what has happened to them."); Thomas D. Lyon & Elizabeth C. Ahern, *Disclosure of Child Sexual Abuse: Implications for Interviewing*, *in* THE APSAC HANDBOOK ON CHILD MALTREATMENT 233, 234-38 (John E.B. Myers, ed.) (3d ed. 2011). Whether Jane Doe 1's testimony on this subject was true or not was a question for the jury. The district court enabled Russell's counsel to establish the chronology of her inconsistent statements

on this subject, thus allowing the jury to weigh her testimony appropriately.

B.  Exclusion of Nudism Expert and Books Containing Photographs of Nude Families and Children

Russell contends that the district court abused its discretion in precluding him from presenting the testimony of attorney Jawn Bauer, who as noted was counsel to various nudist organizations, and in excluding various published works of photography that he kept in his home and that included photographs of nude families and children. He argues that Bauer's proffered testimony on the practice of nudism in the United States would have corroborated Russell's own testimony on that subject and would have placed his own family's experiences and practices in a broader context. The books, Russell reasons, would have been relevant to the jury's determination of his own motives for photographing his children in the nude and "would have given his photographs some context within the broader universe of artistic appreciation for nudes, including nude children, as a long-time subject of photographers." Russell Br. 21.

The court did not abuse its discretion in excluding Bauer's testimony. We may assume that Bauer was qualified to testify as an expert on nudism, but as the district court pointed out, "[t]his case is not about nudism." R. 74 at 18. Testimony about nudism was arguably relevant only to the extent that it may have helped to explain why Russell photographed his daughters in the nude,

why his daughters would have agreed to be photo-graphed by Russell without clothing, and what Russell's purpose was in creating the charged images of his daugh-ters. Frankly, however, we have a difficult time under-standing this line of testimony as anything but a red herring. None of the charged photographs were taken at any of the clothing-optional resorts that Russell and his second wife visited with their children, nor did the defense claim that any of those photographs were the sort of candid snapshots of a family member that one might expect to find among the photos of a family that engages in nudism. All of the charged photographs were staged photographs that the defendant directed to some degree, and both girls testified that they would not have been nude but for purposes of the photography sessions Russell initiated. So far as the girls understood, they were posing in the nude as "models" for photographs that would be posted on their websites along with additional photographs of them fully or partially clothed. Yet Russell himself understood and acknowledged that the nude photographs were not appropriate for posting online. R. 77 at 166. In any case, to the extent nudism was mini-mally relevant in the ways cited by the defense, the district court gave Russell's attorneys ample latitude to elicit testimony from both Russell and his daughters on the subject. Bauer, on the other hand, could not possibly have spoken to any point relevant to the charges in this case. His generalized testimony about the practice of nudism and the values of nudists would have been of no assistance to the jury in evaluating the circumstances under which Russell took the charged photographs and

deciding whether he violated section 2251(a) in doing so. *Cf. Frabizio*, 459 F.3d at 85 & n.8 (because the lascivious nature of charged image is something layperson can determine, expert testimony is not required) (citing *Arvin*, 900 F.2d at 1389-90); *United States v. Thoma*, 726 F.2d 1191, 1200-01 (7th Cir. 1984) (videotapes were sufficient evidence of their own prurient appeal; expert testimony was not required on this point).

Nor did the court abuse its discretion in excluding the published works of photography. As to Russell's motives in taking the charged photographs, these works, by photographers other than himself, were irrelevant. Russell's contention that the books would have placed his own photographs within a broader context of artistic documentation of and appreciation for the nude form, including the nude child, suggests that he wished to invite the jury to compare his photographs to the published work of other photographers and to surmise that his photographs, like theirs, had a legitimate artistic purpose and value. Images of children need not be obscene in order to qualify as lascivious, however. *See New York v. Ferber*, 458 U.S. 747, 760-61, 102 S. Ct. 3348, 3356-57 (1982). Moreover, as the district court pointed out, simply because other works featuring nude photographs of children have been published does not necessarily mean that those photographs are not lascivious. R. 177 at 132-33. Excluding the published works appropriately kept the trial's focus on the charged photographs and whether they were lascivious.

C.  Instruction on Flight

As we noted in our factual summary, Russell and his wife left the United States for Mexico shortly after he was informed by representatives of the U.S. Attorney's office in July 2007 that they were considering the possibility of filing federal charges against him. The government was permitted to elicit this fact from Russell on cross-examination, and in its closing argument, it characterized Russell's departure from the country as flight which evidenced his consciousness of guilt. As we have noted, the district court instructed the jury that "[t]he intentional flight by a defendant immediately after he is accused of a crime that has been committed . . . is a fact which, if proved, may be considered by the jury in light of all the other evidence in the case in determining guilt or innocence." R. 40 at 32; R. 79 at 110 (Instruction No. 24).

Although the court's instruction reflects an accurate statement of the law, *see United States v. Skoczen*, 405 F.3d 537, 549 (7th Cir. 2005); *United States v. Jackson*, 572 F.2d 636, 641 (7th Cir. 1978), Russell contends that it was error for the court to give it because the evidence in this case does not support an inference that he fled the country in order to avoid prosecution. Russell first became aware that he was under investigation in June 2005, when he was served with a search warrant at his home. In Russell's view, the fact that he did not leave the country until more than two years later defeats any inference that he was fleeing the country and thus renders a flight instruction inappropriate.

Russell rightly points out that we have urged caution with respect to both the admission of flight evidence and

instructing jurors on the inferences they may draw from such evidence. *See, e.g., United States v. Robinson*, 161 F.3d 463, 469 (7th Cir. 1998); *United States v. Williams*, 33 F.3d 876, 879 (7th Cir. 1994). The Supreme Court itself has "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." *Wong Sun v. United States*, 371 U.S. 471, 483 n.10, 83 S. Ct. 407, 415 n.10 (1963). We have added that "[b]ecause the probative value of flight evidence is often slight, there is a danger that a flight instruction will isolate and give undue weight to such evidence." *Williams*, 33 F.3d at 879.

Nonetheless, we have sustained the giving of a flight instruction where the facts readily support an inference that the defendant was attempting to evade capture and prosecution. *E.g., Skoczen*, 405 F.3d at 548-49; *United States v. Lewis*, 797 F.2d 358, 368-69 (7th Cir. 1986). Beginning with our decision in *Jackson*, we have said that the probative value of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. 572 F.2d at 639 (citing *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)); *see also, e.g., Skoczen*, 405 F.3d at 548; *Robinson*, 161 F.3d at 469. We have also indicated that the chronology of events, and in particular the passage of time between the commission of a crime or the defendant

being accused of a crime and his purported flight, is a material consideration in our assessment of both the probative worth of flight evidence and, in turn, the propriety of a flight instruction. *Jackson*, 572 F.2d at 640-41. Where a defendant flees in the immediate aftermath of a crime or shortly after he is accused of committing the crime, the inference that he is fleeing to escape capture and prosecution is strong. *See id.* (quoting *Myers*, 550 F.2d at 1051). By contrast, if a substantial amount of time passes before a defendant takes action that the government characterizes as flight, the inference that the defendant is in fact attempting to evade prosecution becomes more tenuous. *Id.* at 641 (quoting *Myers*). We have added, however, that "the importance of the immediacy factor is greatly diminished, if not rendered irrelevant, when there is evidence that the defendant knows that he is accused of and sought for the commission of the crime charged." *United States v. Ajijola*, 584 F.3d 763, 765-66 (7th Cir. 2009) (quoting *Jackson*, 572 F.2d at 641).

In this case, the district court found that each of the four pertinent inferences could be drawn with a sufficiently high degree of confidence to warrant admission of the flight evidence and a corresponding instruction, and we find no abuse of discretion in the court's decision. Russell's departure for Mexico occurred shortly after he and his counsel, at the meeting with federal prosecutors, were shown the photographs that eventually formed the basis for his indictment and were advised that his prosecution for these photographs was a possibility. The jury could reasonably infer from this sequence of events that the meeting triggered a fear of

imminent prosecution in Russell's mind, that he left the country with the purpose of evading prosecution, and that this flight evidenced Russell's awareness that he was guilty of the charges that federal prosecutors were entertaining.

Russell's focus on the date he first learned he was under investigation is myopic. For any number of reasons, criminal charges do not always materialize immediately after an individual is identified as a possible perpetrator of a crime. Thus, in the absence of an arrest and charges, a defendant may perceive (rightly or wrongly) that the chance of prosecution is slight. Later developments, however, may signal that things are about to change, and in conveying that message give the defendant greater reason to flee than he had earlier. A defendant's flight on the heels of such a development may thus be probative of his consciousness of guilt, notwithstanding that it occurs months or even years after the defendant first had reason to know that the authorities suspected him of criminal conduct. For example, in *United States v. Levine*, 5 F.3d 1100, 1107-08 (7th Cir. 1993), we found it probative of the defendant's guilt that he fled within weeks of being asked to provide handwriting exemplars, despite the fact that the request came more than a year after he committed the murders with which he was later charged. We reasoned that he "had no reason to flee until he realized he might face criminal sanctions for the murders." *Id.*

In this case, Russell certainly may have had reason to fear prosecution when he was first served with a war-

rant to search his home in 2005. But at that time, although the authorities were asking him whether he had taken any nude photographs of his daughters apart from the videotape of his daughters at the gymnasium, they did not have in their possession the photographs that would eventually form the basis for his indictment. It was not until more than a year and a half later that Indiana authorities learned of the images of Jane Does 1 and 2 that were discovered on the computer of a Canadian citizen. And it was not until Russell and his attorney met with federal prosecutors in July 2007, were shown copies of those photographs, and were told that criminal charges were a possibility that he knew that the government was prepared to indict him. So the fact that he did not leave the country when he first learned he was under investigation is by no means dispositive of the probative value of his departure. As the Sixth Circuit has observed, it is either "the sudden onset or the sudden *increase* in fear in the defendant's mind that he or she will face apprehension for, accusation of, or con- viction of the crime charged" that renders his ensuing flight probative. *United States v. Dillon*, 870 F.2d 1125, 1128 (6th Cir. 1989) (emphasis in original). Certainly Russell's meeting with prosecutors could have caused a sudden increase in his fear of prosecution. He was not told that charges were certain or even likely, by Russell's account; yet, the meeting certainly upped the odds that charges would materialize, and for that reason Russell's exit from the country soon after that meeting was proba- tive of his consciousness of guilt, as the district court reasoned.

This is true notwithstanding the lack of other evidence that might have enhanced the inculpatory nature of Russell's departure. For example, as Russell points out, the record does not indicate that he used a false passport when he left the country, left his attorney with no contact information, or attempted to conceal his whereabouts. *Cf. Levine*, 5 F.3d at 1106 (defendant relocated, left no forwarding address, and engaged answering service and private mailbox under assumed name). It was only his departure to Mexico after the meeting with the U.S. Attorney's office that the government cited as evidence of his consciousness of guilt. The lack of additional signs that Russell was attempting to evade capture and prosecution might have supported a decision to exclude evidence of flight and obviated any need for a flight instruction. Nonetheless, the timing of Russell's departure readily supports an inference that he was fleeing prosecution and that in turn supports an inference of consciousness of guilt. This is enough to show that the court did not abuse its discretion in permitting the evidence and giving the flight instruction. We note finally that the district court gave Russell's counsel leeway to show, through Russell or other witnesses, that his decision to relocate with his wife to Mexico was not made as a result of his meeting with federal prosecutors or the possibility of prosecution. Russell did not take advantage of this opportunity, but it confirms that he was not unduly prejudiced by the district court's decision.

D.  Reasonableness of the Sentence

As we have noted, the district court ordered Russell to serve a prison term of 456 months (thirty-eight years). Russell contends that this sentence was greater than necessary to comply with the sentencing aims set forth in 18 U.S.C. § 3553(a) and therefore is substantively unreasonable in light of certain mitigating aspects of his offense as well as his lack of prior criminal history and other favorable personal circumstances.

The Sentencing Guidelines called for a life sentence in Russell's case. Most federal statutes do not authorize a life term, and 18 U.S.C. § 2251(e), which specifies a maximum term of thirty years, is no exception. The Guidelines Manual does not specify a means of converting a life term into a determinate period of years or months. However, the Sentencing Commission has equated life imprisonment with a term of 470 months. U.S. Sentencing Commission, 2010 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, app. A, at 2 (15th ed. 2010) ("Length of Imprisonment"), available at http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2010/Appendix_A.pdf (last visited Nov. 7, 2011). The 456-month sentence imposed by the district court in this case is slightly below that term. At the same time, the Guidelines, in cases involving multiple counts of conviction, direct the court "to impose maximum and consecutive sentences to the extent necessary to make the total punishment equal in severity to what the guidelines would require were it not for the statutory maxima." *United States v. Veysey*, 334 F.3d 600, 602 (7th Cir. 2003)

(citing U.S.S.G. § 5G1.2(d)). Following that approach here would result in four consecutive terms of thirty years, for a total of 120 years. *See United States v. Noel*, *supra*, 581 F.3d at 495 & n.4, 500; *United States v. Glover*, 409 F. App'x 13, 15 (7th Cir. 2011) (nonprecedential decision); *United States v. Metzger*, 411 F. App'x 1, 3-4 (7th Cir. 2010) (nonprecedential decision). Obviously Russell's sentence is far below that term. Regardless of which benchmark we employ, we must acknowledge that given Russell's age at sentencing (forty-eight) and remaining life expectancy of roughly thirty years, *see* Social Security Administration, Period Life Table (2007), available at http://www.ssa.gov/oact/STATS/table4c6.html (last visited Nov. 7, 2011), the sentence imposed by the district court is, in actuarial terms, a life sentence.

As Russell has identified no procedural error in his sentencing, our review is confined to the substantive reasonableness of the sentence. *E.g., United States v. Aslan*, 644 F.3d 526, 531 (7th Cir. 2011). Because it is below the range advised by the Guidelines, we presume it to be reasonable. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *United States v. Liddell*, 543 F.3d 877, 885 (7th Cir. 2008). Russell bears the burden of rebutting that presumption by demonstrating that his sentence is substantively unreasonable in light of the sentencing factors set forth in section 3553(a). *Mykytiuk*, 415 F.3d at 608. Russell has not met this burden.

Russell's offenses were very serious. Although, as Russell points out, the district judge remarked that she had "seen much worse" examples of child pornography

than the images with which Russell was charged, R. 81 at 116, she added that they were "bad enough without being the worst of the worst," "horrific," and "beyond the pale," R. 81 at 115, 116, 118. Moreover, these photographs were so widely disseminated on the Internet, if not by Russell himself then by the friend to whom he entrusted them for safekeeping, that they were discovered throughout the United States and in two foreign countries, thus perpetuating and expanding on the harm that Russell did in taking the photographs. R. 81 at 118. The victim impact statements submitted by Russell's daughters spoke poignantly of the sense of betrayal they felt as a result of what he did to them. Moreover, Jane Doe 1's testimony, both at trial and in greater detail at sentencing, made clear that Russell's criminal behavior was not limited to the charged photographs but also included multiple acts of molestation committed against his elder daughter. Those acts, as we have discussed, tend to belie the notion that Russell's motive in taking the charged photographs was innocent and that he inadvertently stepped over the line. His criminal behavior will have long-lasting effects on both of his daughters. The district judge aptly observed that "the ripples that go out from this case go out way beyond anything we can perceive or imagine." R. 81 at 87. The sentence that Judge Barker imposed is consistent with the grave nature of the offense that Russell committed, *see* § 3553(a)(1) and (a)(2)(A), and with the mandate to deter those tempted to commit similar crimes, *see* § 3553(a)(2)(B).

The mitigating personal circumstances that Russell relies on as proof that a lesser sentence would be suf-

ficient to satisfy the statutory sentencing criteria are neither unique nor weighty. Yes, Russell expressed remorse for his acts, but only after being found guilty. Even then, the district court detected a certain "disconnect" between Russell's own perception of what he did and what the evidence revealed about his criminal acts. R. 81 at 88. His college education, job skills, age, marital status, and lack of history of drug abuse are neither remarkable nor so compelling as to call into question the reasonableness of a below-Guidelines sentence. *See United States v. Young*, 590 F.3d 467, 474 (7th Cir. 2009). Russell committed his offenses despite these advantages, and although his positive attributes may distinguish him to some degree from others who commit similar offenses, they are not so extraordinary as to compel a lesser sentence than the one the court imposed.

Russell suggests that the statutory minimum prison term of 180 months (fifteen years) on each of the four counts of conviction (presumably to run concurrently) would be a more reasonable sentence. But even if we assume for the sake of argument that a sentence so far below the life term recommended by the Guidelines could be thought of as reasonable in this case, the district court certainly did not abuse its discretion in concluding otherwise. Russell's crimes, in the district court's words, reflected "exceedingly grave exploitative behavior." R. 81 at 80. The district court was aware of and gave consideration to the mitigating factors. Nothing calls into question the court's conclusion that the below-Guidelines sentence it imposed, although still unquestionably lengthy, was reasonable. *Cf. Noel*, 581

F.3d at 500-01 (affirming eighty-year sentence for nude photographs of sleeping minor).

### III.

For all of the foregoing reasons, Russell's convictions and sentence are AFFIRMED.

GOTTSCHALL, *District Judge,* concurring in the court's judgment. I join the panel's opinion, but write separately to highlight what I view as a degree of unfairness, resulting from a lack of clarity in the caselaw, which affected the district court's pretrial ruling on the admissibility of molestation evidence in the event that the defendant testified.

I agree that it was well within the district court's discretion to exclude, as the district court initially did, the molestation testimony based on the court's conclusion that the probative value of that testimony did not outweigh its prejudicial effect. The district court carefully weighed the relevant Rule 403 considerations, recognizing that the evidence of molestation was remote in time, while also recognizing that the evidence would be extremely prejudicial.

But when the district court made its ruling, it explicitly mentioned the possibility that the defendant, if he testified, could "open the door" to the molestation evidence:

> The door may be opened to the inclusion of that evidence on cross-examination of the defendant, depending on how that testimony goes, and also as possible rebuttal evidence depending on what the defense evidence is, if any.

> The defendant's not obligated to present any evidence, but if the defense does not present evidence on issues that would be—that would make this relevant and relevant as impeachment and relevant as to the charges in the indictment, then it can't come in any other way.

(R. 74 at 26.) As the panel notes, the district court also ruled that Russell could testify about his nudism. Taken together, these rulings "seemed to envision that Russell could testify that the charged photographs were consistent with his own practice of nudism . . . and that the photos were not inappropriate, sexually charged images, without opening the door to evidence that he had previously touched Jane Doe 1 inappropriately." (Maj. Op., *supra* at 31.)

The district court had already excluded the testimony of Russell's nudism expert. Thus, Russell's own testimony was the only way in which he could present his defense: that he was a nudist and a photographer, that his images were a "simple portrayal of nude children" (R. 74 at 16), and that he never intended the photographs

to be lascivious. While his decision to testify exposed him to cross-examination, it was a risk he accepted in light of the understanding that if he testified as predicted, the molestation evidence would not come in.

The record reflects that defense counsel carefully adhered to the limits set by the district court when eliciting Russell's nudism testimony on direct examination. Indeed, Russell's testimony at trial was consistent with what everybody understood and expected that testimony to be. Still, Russell's testimony necessarily "call[ed] into question his purpose and motive in taking the charged photographs." (Maj. Op., *supra* at 31.)

When the district court realized that Russell's intent was at issue, it was entitled to revisit its earlier pretrial ruling. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (noting that "*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial" (citing *Luce v. United States*, 469 U.S. 38, 41-42 (1984)). And I agree that it would not be an abuse of discretion for the court to reverse itself and conclude that the molestation testimony was relevant and admissible under Rule 404(b), and that the probative value of the testimony outweighed its prejudicial effect under Rule 403. But in my view, when a district court revisits a pretrial ruling after a party has materially changed its position in reliance thereon, the court should at least consider the prejudice flowing from that reversal as part of its calculation. *See, e.g., United States v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) (holding that "the district court must consider any preju-

dice that will accrue to the defendant as a result of the court's reversal of an earlier in limine ruling," and citing cases from other circuits that follow this approach). Even if the district court had considered the prejudice flowing from its reversal of its pretrial ruling, however, it seems likely that the court would have allowed the molestation evidence, so central was it to the issue of Russell's intent.

Today's opinion will make clear that in cases like this one—that is, where the defense is that the images are simple portrayals of naked children which were not intended to be lascivious—the primary focus in evaluating the legality of the charged photographs remains on the images, but "the intent and motive of the photographer can be a relevant consideration in evaluating those images." (Maj. Op., *supra* at 26.) *See also United States v. Noel*, 581 F.3d 490, 499-500 (7th Cir. 2009); *United States v. Burt*, 495 F.3d 733, 736 (7th Cir. 2007). With this clarification, both district courts and litigants should be in a better position to evaluate the consequences of defense evidence, whatever form that evidence takes, that a photographer did not intend the subject images to be lascivious.